**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**
Honorable Marcia S. Krieger

Civil Action No. 08-cv-00910-MSK-KMT

AMERICAN CIVIL LIBERTIES UNION OF COLORADO,
AMERICAN FRIENDS SERVICE COMMITTEE,
AMERICAN INDIAN MOVEMENT OF COLORADO,
AMERICANS FOR SAFE ACCESS,
CODEPINK,
ESCUELA TLATELOLCO CENTRO DE ESTUDIOS,
LARRY HALES,
GLEN MORRIS,
RECREATE 68,
ROCKY MOUNTAIN PEACE & JUSTICE CENTER,
DAMIAN SEDNEY,
TENT STATE UNIVERSITY,
TROOPS OUT NOW COALITION, and
UNITED FOR PEACE & JUSTICE,

        Plaintiffs,

v.

CITY AND COUNTY OF DENVER,
MICHAEL BATTISTA,
UNITED STATES SECRET SERVICE, and
MARK SULLIVAN,

        Defendants.

---

## OPINION AND ORDER

---

In August 2008, the Democratic National Convention will be held in Denver, Colorado.

This matter concerns claims that the security restrictions imposed during the Convention will

violate the Plaintiffs' rights to freedom of speech and assembly under the First Amendment to the

Constitution of the United States of America.

1

Convention activities will be hosted at two venues. Activities on the first three days of the Convention will be held at the Pepsi Center; the activities on the final night of the Convention will be held at Invesco Field at Mile High Stadium. Because issues concerning security restrictions at Invesco Field have not been framed or tried, this opinion addresses only restrictions associated with events at the Pepsi Center.[1]

The Plaintiffs have specifically identified four facets of the security restrictions that they contend infringe upon their First Amendment rights:

- The location and configuration of the Public Demonstration Zone on the Pepsi Center grounds, being outside "sight and sound" of delegates and the Pepsi Center building itself, renders it an inadequate alternative to offset the closure of some public streets to First Amendment uses;

- The terminus of the approved route for parades scheduled during the Convention, on Monday, August 25, through Wednesday, August 27, is not within "sight and sound" of the Pepsi Center;

- The route for parades scheduled before the Convention begins, on Sunday, August 24, does not travel over Chopper Circle; and

- The City of Denver denied a permit to Plaintiff Recreate 68 for an afternoon parade on Monday, August 25 through downtown Denver, citing traffic and staffing concerns.

---

[1]The Court will conduct a separate trial on August 12, 2008, to address any First Amendment issues relating to security arrangements at Invesco Field. For a variety of reasons, the Court finds it suitable to render this Opinion as to the Pepsi Center issues separately and before trial on the Invesco Field issues. However, because there is some factual and legal overlap between the Pepsi Center and Invesco Field issues, the Court finds that this decision is not suitable for certification pursuant to Fed. R. Civ. P. 54(b). *See generally Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005).

The Court has considered the factual stipulations of the parties **(# 104, 110)**; the testimony of nine witnesses in a trial to the Court on July 29, 2008 **(# 116, 117)**; the exhibits[2] received as evidence at that trial; and the written **(# 105, 108, 109, 118)** and oral arguments **(#121)** of counsel.[3] As set forth more fully herein, the Court finds that the restrictions inhibit the Plaintiffs' ability to engage in some forms of expressive conduct. However, the Court also finds that the restrictions are justified by important governmental interests, are narrowly tailored to meet those interests, and the Plaintiffs have a wide variety of alternative means of expression that will allow them to effectively communicate their messages. Thus, although these restrictions impact the Plaintiffs' ability to assemble and express their views as they desire, the Court concludes that they do not unconstitutionally impair the Plaintiffs' First Amendment rights.

## I. PROCEDURAL CONTEXT AND JURISDICTION

This action has evolved and the issues have been narrowed through consistent, good faith negotiation among the parties and the professionalism and skill of their counsel. Heeding the admonition of courts that have previously addressed similar claims on the eve of a national political convention,[4] this action was initiated on May 1, 2008, before details of the

---

[2]Specifically, the Court received and has reviewed Exhibits 1, 2, 4, 5, 6-1 through 6-6, 7, 8-1, 8-2, 9-1, 9-2, 9-4(a), 9-4(b), 9-6, 9-8, 9-9, 13, 15, 16, 19, 21, 22, 25, 40, 43-48, 51, 52, 55-58, 61, 64, 68, 72, 99, 103, 105, and 106.

[3]With the consent of the parties, the undersigned privately visited the Pepsi Center grounds prior to trial, solely for the purpose of obtaining context for the receipt of the evidence at trial. The visit was not evidentiary in nature, and the Court has not drawn upon anything viewed during that visit in reaching the opinions here.

[4]*Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 16 (1st Cir. 2004) (Lipez, J. concurring) ("In the future, if the representatives of demonstrators ask the courts to modify security measures developed over many months of planning for an event of this magnitude, they should come to court when there is enough time for the courts to assess fully the impact that

Convention's security restrictions had been announced. The original Complaint (# 1) and Motion for Preliminary Injunction (# 2) sought to compel production of information about the intended restrictions, so as to then allow the Plaintiffs to mount a substantive challenge to the restrictions that would be revealed. Through diligent negotiation, the parties were able to resolve issues related to the production of the security information (# 46). Thereafter, the Plaintiffs filed an Amended Complaint (#48), leveling the substantive First Amendment challenges presented herein. (The Plaintiffs have withdrawn other claims grounded in Article II, Section 10 of the Colorado Constitution.) The Defendants filed Motions to Dismiss (#70,72) some of the claims, but the parties have been able to resolve the issues raised in those motions, rendering them moot.[5]

The Plaintiffs' claims in this case are asserted pursuant to 42 U.S.C. § 1983, which provides for suits to vindicate violations by state actors of rights and privileges secured by the Constitution or laws of the United States.[6] As to all claims, the Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331. In addition, because the United States, through the

_____

modifications will have on the security concerns advanced").

[5]Accordingly, the Motions to Dismiss (# 70, 72) are denied as moot.

[6]The Amended Complaint (#48) does not clearly state the jurisdictional basis for suit against the Secret Service and Defendant Mark Sullivan, who are federal actors and thus, not subject to 42 U.S.C. § 1983. The Court assumes that the parties intend the §1983 claim to be treated as *Bivens* type claim with regard to Mr. Sullivan and the Secret Service. *See generally Hartman v. Moore*, 547 U.S. 250, 254 n. 2 (2006) (describing a *Bivens* action as "the federal analog to suits brought against state officials" under §1983). As no objection by the Secret Service has been raised, the Court does not address whether such a claim can be asserted against it as an agency, rather than only as against individual officers.

Secret Service, is a Defendant, the Court also has subject matter jurisdiction pursuant to [28 U.S.C. §1346(a)(2)](#).

## II.  GENERAL FACTS

The facts pertinent to all of the challenged restrictions are summarized below.  Those facts which are uniquely important to a particular restriction will be addressed in greater detail in the analytical discussion.

### The Convention

The 2008 Democratic National Convention will be held in Denver, Colorado from Monday, August 25, through Thursday, August 28, 2008.  The activities on the first three days/nights of the Convention will be held at the Pepsi Center; the final night of the Convention will be held at Invesco Field at Mile High Stadium.  The Convention is expected to bring as many as 50,000 attendees to Denver, including 6,000 delegates, 14,000 Democratic Party officials and guests, and 15,000 members of the domestic and international media.  In addition, it is expected that the Convention will attract tens (some witnesses believe hundreds) of thousands of people who desire to publically express their views on various subjects through speeches, leaflets, demonstrations, and protests.  The Plaintiffs are organizations and individuals who do not necessarily share the same agenda or viewpoint, but who all desire to communicate a message to the delegates, the media, and the general public prior to and during the Convention.

### The Pepsi Center

Although Convention-related activities will take place in a variety of arenas around the city throughout the day, the main events of the Convention will occur on afternoons and evenings inside the Pepsi Center.  The Pepsi Center is a privately owned sports arena located on the edge

of downtown Denver.  Its grounds are bordered on the northeast by Speer Boulevard, a heavily-used, divided, multi-lane thoroughfare into downtown Denver; on the southeast by Auraria Parkway,[7] another prominent, divided, multi-lane street; and on the southwest and northwest sides by railroad tracks, the Elitch Gardens amusement park, and eventually, the South Platte River.  Both Speer Boulevard and Auraria Parkway offer entrances to/exits from Interstate 25, a major traffic artery that passes between the Pepsi Center and Invesco Field.  (For aid in understanding the area in question, Trial Exhibit 43 is reproduced on the following page.)

The Pepsi Center grounds consist of several large parking lots, a handful of small commercial buildings, and the Pepsi Center itself, a large, circular enclosed arena.  Although the Pepsi Center grounds are privately-owned property, a number of public city streets, notably 7th Street, 9th Street, and Chopper Circle enter into the grounds.  During times when Convention activities are taking place, as many as 26,000 people may be inside the Pepsi Center itself, and another 30,000-40,000 people, including media, law enforcement personnel, Pepsi Center workers, and others may be present on the Pepsi Center grounds.

**Security plans**

Planning for the Convention began more than 18 months ago.  In April 2007, the Department of Homeland Security designated the Convention a "National Special Security Event."  This designation authorized the United States Secret Service as the lead agency to design and implement, in conjunction with the City of Denver and Convention organizers,

---

[7]Technically, "Auraria Parkway" is the name of only the southern, eastbound half of the divided highway.  The northern, westbound lanes of travel are named "Colorado Avalanche Boulevard."  For economy's sake, the Court will refer to the entire road in both directions as Auraria Parkway.



EXHIBIT
43
08-cv-00910-MSK-KMT

7

security measures for the Convention. In developing the security plan, Denver formed a number of committees to work with the Secret Service and Convention organizers, and met representatives of other state and federal agencies, some of the Plaintiff organizations, and others to discuss various security concerns and decisions. After consideration of a wide range of the anticipated needs, resources, expectations, and contingencies, a consolidated Convention security plan was designed. The plan has the objectives of providing security to convention attendees and those at the convention site, keeping downtown Denver open and functioning, ensuring a functioning transportation network, and providing for public safety.

Details of the plan are discussed in greater detail below. It is sufficient at this point to note that the central feature of the security plan is the creation of a "security perimeter" that encloses the entirety of the Pepsi Center grounds, as well as those portions of Auraria Parkway and Speer Boulevard adjacent to the Pepsi Center grounds. The security perimeter will become effective on Friday, August 22, and will remain enforced through the conclusion of Convention activities on Wednesday, August 27. Only those persons holding credentials issued by the Convention Committee will be permitted to pass through the security perimeter, only at designated entrance checkpoints and only after having undergone a magnetometer-based security screening.

City streets that fall within the security perimeter, such as Chopper Circle and portions of 7th Street and 9th Street, will effectively be closed to the public during this period. In addition, nearly all of Auraria Parkway will fall within the security perimeter and be closed to public use, with the exception of authorized parades on Sunday, August 24. Similarly, with the exception of inbound rush hour traffic between 6:00 a.m. and 9:00 a.m. each weekday, Speer Boulevard will

be closed to public use from Interstate 25 to Larimer Street for the duration of the Convention. As discussed below, the security plan at the Pepsi Center is designed to protect Convention attendees, the public, and physical assets against attacks involving explosives and weapons; secure the Convention against unlawful disruption or violent protests; ensure unobstructed emergency access into and out of the Pepsi Center grounds, and to preserve orderly traffic flow into and around downtown Denver.

### Public/Demonstration Zone[8]

Ordinarily, public streets are considered traditional public fora where individuals can freely exercise their First Amendment rights. In recognition of the fact that the security perimeter compromises the public's ability to engage in First Amendment activities on the closed streets, the Defendants have designated a portion of Parking Lot A on the Pepsi Center grounds as a "Public/Demonstration Zone."

The Public/Demonstration Zone (sometimes "the Zone") will be located in the southernmost portion of Parking Lot A. The boundaries of the Zone are Auraria Parkway on the southeast, 7th Street on the Southwest, and a large "media pavilion" tent that stands to the northeast and shares the remainder of Parking Lot A. The northwest boundary of the Zone is not defined by any specific geographical or topographical features. Rather, it will be established by a set of barriers placed roughly halfway along the northwest/southeast axis of the parking lot. The

---

[8]Nomenclature being an important part of framing an issue, the parties have each referred to this area by a different term. The Defendants prefer to call it a "public access area." Some of the Plaintiffs refer to it as a "free speech zone," and sometimes, a "freedom cage." The Court adopts the term "Public/Demonstration Zone," in part because it is similar to the terminology most commonly used by the witnesses. Although the parties' written submissions did not punctuate it in the manner that this Court has, the inclusion of the slash renders the phrase the most neutral and apt description of the multiple purposes the Zone is intended to serve.

Zone will cover approximately 47,000 square feet. Because of street closures – particularly, the closure of Auraria Parkway – the only access to the Zone will be from the south, along 7th Street, or from the southeast from Larimer Street and crossing over parking lots on the Auraria Campus. (Trial Exhibit 46, showing the orientation and features of the Public/Demonstration Zone, is reproduced on the following page.)

The Zone will be enclosed on three sides by two rings of concrete "Jersey barriers," topped with chain-link fencing. These two rings will be located 8 feet apart, thereby creating a "buffer zone," which will allow law enforcement officers an opportunity to intercept any person who evades the inner ring of barriers. The fourth side of the Zone, along Auraria Parkway, will not be enclosed, but to access the northwestern edge of the Zone, visitors will be required to pass through an array of low concrete barriers.[9] The top of the Zone will be open.

Water stations and sanitary facilities will be provided within the Zone. In addition, the City of Denver will provide an amplification system within the Zone, with speakers directed both internally into the Zone, as well as externally, facing the path that delegates are expected to walk. Short of enforcement of generally applicable laws, there will be no government control exercised over the sound system; users are expected to regulate its use. In addition, anyone entering the Zone may bring a bullhorn, other sound amplification device, or any other items that are not otherwise prohibited under established city ordinances. Individuals entering the Zone will not be subjected to searches, except insofar as a search would otherwise be permissible under existing constitutional law (*i.e.* upon probable cause).

---

[9]Testimony at trial described the purpose of the array of barriers in the midst of the Zone as providing some protection against crowd surges that could lead to persons being crushed.



MEDIA TENT

AREA OPEN TO DELEGATES

5' Egress Lanes

Remove Power Pole

PUBLIC DEMONSTRATION ZONE

3 Jersey Barrier Array

Temporary Asphalt Path For ADA Access

7th St Auraria Pkwy

**EXHIBIT 46**
08-cv-00910-MSK-KMT

11

The Zone is located and designed to allow those inside to be seen and heard by Convention delegates. It is anticipated that most delegates will be transported by Convention-supplied bus transportation to the Pepsi Center and that delegates will be dropped off at a screening location somewhere west of 7th Street and the Zone. After being screened, delegates will walk along a tree-lined sidewalk through the middle of the grounds to the Pepsi Center entrances. The sidewalk passes parallel to the northwest face of the Public/Demonstration Zone. During that portion of their walk, the delegates will be approximately 200 feet away from persons standing at the northwest edge of the Zone. There will be no obstructions between the delegates' sidewalk and the Zone itself. Thus, any delegate wishing to approach the demonstrators may leave the sidewalk and walk directly to the edge of the buffer zone. This would place the delegate within 8 feet of those in the Public/Demonstration Zone.

The fencing and buffer zone will effectively prohibit the passage of leaflets or other material to the delegates. To address this, the City has agreed to collect leaflets from any organization or member of the public who wishes to provide them.[10] The collected leaflets will be placed on tables along the delegates' sidewalk, such that delegates can take and peruse them. Persons in the Public/Demonstration Zone can watch and encourage delegates to take specific leaflets. The leaflets supplied by individuals and organizations will be "screened for security purposes" by the Secret Service in the same manner as other material entering the Pepsi Center grounds, but it does not appear that the material will be reviewed by the City of Denver or the Secret Service for its content or for any other purpose.

---

[10]The parties' stipulation appears to indicate that, in lieu of printed leaflets, individuals and organizations may also submit electronic files that will be made available to delegates by means of a computer and attached printer that will be located on the leaflet tables.

Although Convention planners anticipate that most delegates will rely on bus transportation to get to the Convention, some delegates may choose to walk or use some other form of transportation. Delegates who arrive at the Convention by other means may avail themselves of alternative entrances to the security perimeter and might not pass along the sidewalk near the Public/Demonstration Zone. Nevertheless, the geography of the Pepsi Center grounds, along with the closure of Speer Boulevard and Auraria Parkway, effectively ensure that any delegate attempting to enter the security perimeter by any means will do so by travelling through or close to an area where the public is free to assemble and speak.

The Defendants have stated that the Public/Demonstration Zone was situated to allow for communication opportunities with the delegates. (The Defendants explain that persons in the Public/Demonstration Zone will be the "welcoming committee" for delegates, as the Zone will be the first thing delegates encounter after getting off buses and being screened.) However, the Zone was not designed to provide unobstructed views of the Pepsi Center building itself. The sightline to the Pepsi Center is significantly blocked by the adjacent media pavilion tent to the northeast, and, from many vantage points in the Zone, only the roof of the Pepsi Center will be visible. However, as noted in more detail herein, there are several other locations open to the public that allow for partially- and fully-unobstructed views of the building itself.

**Parade routes**

In its February 2008 Emergency Event Declaration, the City of Denver designated an "approved parade route" that would be made available for public marches during the Convention. As many as five parades per day are scheduled on the approved parade route, occurring almost continually from 11:00 a.m. to 2:30 p.m. each day of the Convention. All told, a dozen or more

organizations will be formally represented in the various parades. The parties anticipate that each parade might involve as many as 10,000 participants, as well as numerous vehicles. Some of the Plaintiffs here will be represented in parades on each day of the Convention.

The approved parade route begins in Civic Center Park, proceeds west along Colfax Avenue, turns north onto Speer Boulevard, and ends at the intersection of Speer Boulevard and Larimer Street. At that point, vehicles will exit the parade route in an unspecified direction. Marchers may elect to travel northwest on Larimer Street into downtown Denver, to double back by heading south along Speer Boulevard, or may proceed southwest along a fixed route on Larimer Street that will pass through the University of Colorado's Auraria Campus and eventually deposit pedestrians near the Public/Demonstration Zone at 7th Street. Because of the closure of Speer Boulevard and Auraria Parkway, pedestrians cannot travel northwest towards the Pepsi Center on Speer Boulevard from the parade terminus. Although the record is not clear, the evidence suggests that some or all of 9th and 12th Streets between Auraria Parkway and Larimer Street will be closed to pedestrian traffic as well. (Trial Exhibit 6-1, showing street closures, the approved parade route, and an approximation of the path marchers may take from the parade terminus to the Public/Demonstration Zone, is reproduced on the following page. The Court notes that the map is somewhat inaccurate, insofar as what appears to be the Public/Demonstration Zone (the orange rhombus) and the route leading thereto (shown by the red line) are incorrectly shown at the intersection of 9th Street and Auraria Parkway. In actuality, the Zone will be located at the next intersection to the southwest, at 7th Street and Auraria Parkway, and the route leading there should head roughly west-northwest (*i.e.* diagonally) from the indicated turn at Larimer and 9th Streets.)

14



Ex. 6-1

The formal terminus of the approved parade route, at the corner of Larimer Street and Speer Boulevard, is approximately 1,800 feet from the Pepsi Center itself, mostly across parking lots and athletic fields. The Plaintiffs offered into evidence several photographs of the parade terminus to show the extent to which the Pepsi Center can be seen in the background. As much as most of the upper half of the Pepsi Center can be seen from the parade terminus, and as little as a small sliver of the building is visible, depending on the viewing angle.

Another parade route has been authorized for Sunday, August 24, 2008, the day before the Convention begins ("the Sunday parades").[11] Plaintiffs Tent State University and Recreate 68 have each been granted a permit to conduct a Sunday parade, each of which is expected to draw 20,000 or more marchers. The Sunday parades will follow the approved parade route, but instead of ending at Larimer Street, will proceed down Speer Boulevard to Auraria Parkway and turn southwest along Auraria Parkway, ending at a terminus at or near the Public/Demonstration Zone.

According to the Plaintiffs' calculations, the Sunday parades will pass as close as 450 feet to the Pepsi Center (near the intersection of Auraria Parkway and 9th Street). Neither party offered photographs showing sight lines along the Sunday parade route, but overhead photographs and maps of the Pepsi Center grounds[12] suggest that the marchers in the Sunday

_____

[11]In addition to parades along the approved parade route and the Sunday parades, Plaintiff Escuela Tlatelolco Centro De Estudios sought and obtained permission to conduct an additional parade from the intersection of Colfax Avenue and Mariposa Street, traveling south towards Sunken Gardens Park.

[12]Admittedly, Trial Exhibit 43 above, showing an aerial view of the Pepsi Center surrounded by empty parking lots, is not a completely accurate representation of how the area will look during the Convention. Other maps in the record indicate that nearly all of the parking lots on the Pepsi Center grounds will be devoted to broadcast areas, media pavilions, and other

parades will have several opportunities for unobstructed (or minimally obstructed) lines of sight to the Pepsi Center building.

### Downtown parade permit denial

In addition to its Sunday and daily parades during the Convention, Recreate 68 requested a permit to conduct a parade involving 10,000-20,000 marchers to take place at noon on Monday, August 25, through downtown Denver and ending at a federal courthouse[13] (the "Downtown parade"). The requested route would begin at Civic Center Park, travel to and along the 16th Street pedestrian mall to Champa Street, then turn north on Champa Street to its destination.

The City denied the requested permit because it would "substantially interfere with traffic in the area" because "there are not sufficient city resources [*i.e.* police officers] to mitigate the disruption," and because the requested route "would limit accessibility of the [16th Street Mall] shuttle buses as well as severely impact the light rail system." Denver's Manager of Public Works, Guillermo Vidal, testified that a march northeast along the 16th Street pedestrian mall

---

Convention purposes. The Court assumes that many, if not all, of these areas will be covered with large tents similar to that which currently stands between the Public/Demonstration Zone and the Pepsi Center. Tents of this size may present significant obstructions to ground-level sight lines. The Court has taken these possible obstructions into mind but observes that in any event, there are certain to be unobstructed lines of sight to the Pepsi Center as marchers approach and pass intersections at 11th Street and 9th Street. In addition, photographs in evidence show only mildly obstructed sight lines of the Pepsi Center from the corner of Speer Boulevard and Auraria Parkway on the Sunday parade route.

[13]There was some confusion as to which federal courthouse was the intended destination of the march. The permit initially sought by Recreate 68 requested a route ending at the White Courthouse at 18th and Stout Streets. Mr. Cohen testified at trial that, regardless of prior representations, Recreate 68 wished to march to the Arraj Courthouse at the corner of 19th and Champa Streets. Any difference in identified destinations does not materially alter the analysis, and the Court will assume that all parties' prior positions would apply equally to a march ending at the Arraj Courthouse.

would cross seven perpendicular streets that carry typically large amounts of downtown traffic and which will already be overburdened by vehicles seeking to avoid street closures incident to the approved parade route and security perimeter. In addition, the march would cross over two sets of light rail tracks, slowing or effectively stopping several train routes through downtown for the duration of the parade, and potentially obstructing shuttle buses that run the length of the 16th Street mall. The Plaintiffs concede that the denial of the permit does not prevent Recreate 68 from using public sidewalks to conduct a march, so long as marchers obey all traffic laws and signals, nor does it prevent the public from assembling at the destination courthouse.

**Additional avenues for communication**

Although the Convention will require the closure of some streets in and around the Pepsi Center, the remainder of traditional public fora in the city will remain open and available to those wishing to express themselves. Commonly used public fora such as Speer Boulevard south of Larimer Street, the 16th Street pedestrian mall, and all downtown sidewalks will remain available for First Amendment expression, subject only to generally applicable state laws and city ordinances. In addition, the City of Denver has issued scores of permits to groups – including some of the Plaintiffs – who seek to conduct rallies, demonstrations, and events in various city parks during the Convention. These events and gatherings are expected to involve thousands to tens of thousands of participants and, one may reasonably assume, will attract significant media attention.

Convention delegates, guests, and other Convention attendees will be staying at 27 different properties around the metro Denver area. Mr. Battista testified that there are no

restrictions that will significantly curtail the rights of persons to engage in speech, assembly, leafletting, or other forms of First Amendment activity at and around these hotels.[14]

### III. ISSUES PRESENTED

At the request of the Court, the parties filed statements **(# 106, 107)** of the issues they intended to try. As sharpened by colloquy at the Final Pretrial Conference **(# 114)** the Court understands that the Plaintiffs identified four specific decisions that they contend operate to violate their First Amendment rights:

1. The Public/Demonstration Zone's location and configuration prevents "visual and acoustic proximity" to the Pepsi Center;

2. The "approved parade route" fails to pass within "sight and sound" of the Pepsi Center;

3. The Sunday parade route fails to allow access to Chopper Circle;

4. The City denied Plaintiff Recreate 68's request to conduct the Downtown parade.

For each of these alleged infringements, the Plaintiffs request relief in the form of a permanent injunction[15] mandating that the Defendants change the security restrictions to correct the deficiency. Because an essential element of entitlement to a permanent injunction is a

---

[14]On cross-examination, Mr. Battista testified that there would be some security precautions in place as delegates boarded buses at their hotels, but those measures would be directed at keeping demonstrators from touching the buses, not impeding demonstrators' ability to approach the delegates.

[15] To be entitled to a permanent injunction, the Plaintiffs bear the burden of proving four elements: (i) actual success on the merits; (ii) irreparable harm that will occur if the injunction is not issued; (iii) a balance of hardships tipping in the Plaintiffs' favor; and (iv) that the requested injunction is not adverse to the public interest. *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1180 (10th Cir. 2003).

showing of actual success on the merits of the claims, the Court first assesses the substantive merit of the Plaintiffs' claims that the identified practices violate the First Amendment.

## IV. ANALYSIS

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Although the First Amendment expressly speaks to a limitation on "Congress," it is well-settled that its prohibition on undue abridgement of speech and assembly applies with equal force to state action. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n. 1 (1996).

The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," and the protection of speech on public issues is one of "central importance." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (internal quotes omitted). The freedoms of speech and assembly protected by the First Amendment are perhaps the most cherished of all Constitutional protections, and actions which abridge them should necessarily be viewed with concern.

"Traditional public fora" – namely, public streets, sidewalks, and parks – have long been recognized as places in which assembly, communication of thoughts between citizens, and discussion of public issues should be welcomed. *Boos*, 485 U.S. at 318. Such places "occupy a special position in terms of First Amendment protection," and the government's ability to restrict expressive activity in such public fora is "very limited." *Id.*

### A. Time, place, and manner restrictions on public expression

Despite their importance, the rights conferred by the First Amendment are not absolute. Even in a traditional public forum, the government may impose reasonable restrictions on the time, place, and manner of protected speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Such restrictions are constitutional if: (i) they are justified without regard to the content of the speech; (ii) they are narrowly-tailored to serve a significant governmental interest; and (iii) there are ample alternative channels for communication of the desired message. *Id.*

The party asserting the First Amendment violation has the burden to prove that the restrictions affect protected expression in a traditional public forum. Once that burden is satisfied, the burden shifts to the government to establish the three elements described in *Ward*. *See e.g. U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000) ("[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions").

### 1. Content neutrality

The level of scrutiny applied to a governmental burden on First Amendment rights depends on whether or not the regulation affecting speech is content-neutral. The government may not regulate speech either because it favors or disagrees with the message the speech conveys. *Ward*, 491 U.S. at 791; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). A regulation on speech that discriminates against speakers based upon the content of their speech is subject to the highly exacting strict scrutiny review. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983). That is, the government must show that its regulation is necessary

to serve a compelling state interest and must be the least-restrictive means available to serve that purpose. *Id.*

However, regulations that are justified for reasons independent of the content of the speech they affect are subject to less stringent review that is more deferential to the government. This is because "[c]ontent-neutral regulations do not pose the same inherent dangers to free expression that content-based regulations do." *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 213 (1997) (internal quotes and cites omitted). Thus, the government is granted more latitude in designing a regulatory solution to perceived problems. *Id.*

In determining whether a restriction is content-neutral, a court focuses upon the government's purpose in imposing the restriction, not the effect that the restriction has upon a given speaker. *Ward*, 491 U.S. at 791. If the justification for the restriction does not pertain to the content of the regulated speech, then the restriction is considered content-neutral. *Id.* A content-neutral regulation is permissible, even though it may operate to affect only certain speakers but not others. *Id., citing Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47-48 (1986) (regulation of only those movie theaters that specialized in adult films was content-neutral; even though regulation was <u>defined</u> by the content of the theater-owners' speech, the <u>justification</u> for the regulation was the "secondary effects" – increased crime and reduction of property values – that flowed from such speech); *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 763 (1994) (conduct-based injunction that tended to affect people with a particular viewpoint does not itself render the injunction content- or viewpoint-based); *c.f. Boos*, 485 U.S. at 320-21 (regulation prohibiting display of signs critical of foreign governments near embassies was content-based and thus subject to strict scrutiny).

**2. Significant governmental interest / narrow tailoring**

To be constitutional, a content-neutral restriction on speech must also be "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 796. To determine whether a restriction is narrowly tailored, courts focus on two components: whether there is a governmental interest that is "significant" and whether the restriction is "narrowly tailored" to serve that interest.

Courts have recognized a variety of sufficiently significant governmental interests that justify limitations on public speech. These have included protecting public fora such as city streets and parks from excessive noise *(see Ward*, 491 U.S. at 796-97, *citing Kovacs v. Cooper, 336 U.S. 77, 86-87 (1949)*), maintaining public spaces in an attractive and available condition for the enjoyment of the general population (*see Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296 (1984)), and preserving order and public safety, such as by ensuring the free flow of traffic on streets and sidewalks *(see Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 375-76 (1997)). More recently, cases involving restrictions attendant to political conventions and meetings of world leaders have uniformly found that maintaining physical security of persons and property involved in a high-profile event is a governmental interest of "the highest order." *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007).

To be "narrowly tailored" to serve a particular governmental interest, the restriction must not "burden substantially more speech than is necessary to further" the stated interest. *Turner Broadcasting*, 520 U.S. at 214 (internal quotes omitted). The essence of such narrow tailoring is that the regulation "focuses on the source of the evils the [government] seeks to eliminate,"

without significantly restricting a substantial quantity of expressive conduct that does not create

the same evils. *Ward*, 491 U.S. at 799 n. 7.   The court looks to see if the regulation is a

sufficient "fit" to the problem that it is intended to prevent, and then the court determines

whether the regulation burdens more speech than is necessary to achieve that fit.  In this analysis,

courts are not free to speculate as to what other means a government might use to accomplish its

objective. An otherwise content-neutral regulation is not rendered invalid "simply because there

is some imaginable alternative that might be less burdensome on speech."[16] *Turner Broadcasting,

520 U.S. at 217*.  The test of content-neutral restrictions is not whether the government's interest

could be adequately served by another marginally less-restrictive alternative or what the court

might perceive to be a more appropriate method of satisfying that interest, but instead whether

the restriction is substantially broader than is necessary to achieve its purpose. *Turner

Broadcasting, 520 U.S. at 217-18*; *Ward*, 491 U.S. at 799.

### 3.  Ample alternatives for communication

For a content-neutral, narrowly tailored restriction on public speech to be constitutional,

the restriction must also allow ample alternatives for the speaker to communicate his or her ideas.

Because Supreme Court precedent has not addressed this requirement in detail, the Court turns to

decisions of other courts that interpret and apply this requirement.

In *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1024 (9th Cir.

2008), the court identified several considerations that may bear on whether alternatives for

---

[16]This is distinct from the "no less-restrictive alternative" test that is applied in strict
scrutiny cases.  With a content-neutral restriction, the government is not required to show that its
goals could not be achieved without burdening as much speech as it currently does.  *Turner
Broadcasting, 520 U.S. at 218*.

communication are ample and adequate: (i) whether the alternative permits the speaker to reach his or her intended audience; (ii) whether the location of the expressive activity is part of the expressive message, such that engaging in the activity in another location would dilute the speaker's message; (iii) whether the alternative forum is susceptible to spontaneous outpourings of expression, or whether the resort to the alternative forum requires advance notice, registration, or some other burden to spontaneous speech or assembly; and (iv) the cost and convenience of the alternatives. *Id.*, citing, inter alia, *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984) (20-day advance notice requirement for parade permit impermissibly burdened opportunities for spontaneous assembly in response to current events).

The 8th Circuit viewed the adequacy of alternatives more narrowly in *Phelps-Roper v. Nixon*, 509 F.3d 480, 488 (8th Cir. 2007). It suggested that the speaker's access to a particular, desired audience is an important component in the alternatives analysis. In *Phelps-Roper*, the court upheld a preliminary injunction blocking a law against protesting at funerals. In addressing the speaker's likelihood of success on the element of whether the regulation presented adequate alternative channels for communication, the court noted that "plaintiffs wish to express an opinion about an individual to that individual and others, and they wish to direct their message at that individual." Therefore, allowing them to picket in the town square or even the next block does not satisfy the second *Ward* requirement of [alternative avenues for communication]." *Id.,* quoting *Kirkeby v. Furness*, 92 F.3d 655, 662 (8th Cir. 1996). The court noted the importance of allowing the speaker to direct his or her "intended message to the intended recipients." *Id.*

From these cases, the Court discerns that the "ample alternatives" element is a multi-factor, fact-intensive inquiry. While it must give some deference to the speaker's desire to reach

a particular audience or speak at a particular place, it does not <u>require</u> that the speaker have the ability to engage in precisely the same means of expression in precisely the same location, nor does it require that the speaker have the ability to communicate in the same manner as he or she wishes. *Berger v. City of Seattle*, 512 F.3d 582, 598 (9th Cir. 2008). For example, adequate alternatives may exist, even though the alternative channels do not necessarily permit the same quantity of speech, prohibit the preferred method of communication, or reduce the size of the potential audience. *Sullivan v. City of Augusta*, 511 F.3d 16, 44 (1st Cir. 2007) (finding ample alternatives existed to parade permitting process that adversely affected indigents). Ultimately, the alternatives analysis focuses on whether the speaker retains other reasonable opportunities to meaningfully communicate his or her message. *Berger,* 512 F.3d at 597; *Sullivan*, 511 F.3d at 44.

### B. Illustrative cases

With these basic principles in mind, the Court turns its attention to several cases in which high-profile political conventions or gatherings of world leaders have generated First Amendment challenges similar to those raised by the Plaintiffs.

#### 1. *Citizens for Peace In Space v. City of Colorado Springs*

In the Tenth Circuit, the most recent case addressing similar issues is *Citizens for Peace In Space v. City of Colorado Springs*, 477 F.3d 1212 (10th Cir. 2007). In it, the court considered restrictions attendant to a meeting of NATO representatives in Colorado Springs. The Court found that the establishment of a security zone extending in a radius of several blocks around the site of the meeting did not burden the First Amendment rights of the plaintiffs. As here, the security zone excluded non-credentialed members of the general public, effectively preventing the

plaintiffs from staging a protest within direct visual range of the site of the meeting. *Id.* at 1217-19. Instead, the plaintiffs were forced to conduct their expressive activities at the edge of the security zone, hundreds of yards away, visible to meeting attendees only as their bus passed by the plaintiff's protest. *Id.* at 1218. The plaintiffs conceded that the security zone restrictions were content-neutral, and the 10th Circuit found that the city's proffered justifications for the restrictions on public access to the site – securing the meeting site against both explosives and "disorderly and violent protestors" – were not only significant but "of the highest order." *Id.* at 1220.

The court extensively discussed its assessment that the city's restrictions were narrowly tailored to meet the identified security interest. It noted that "[i]t is not enough that the City justify its restrictions based broadly on 'security'," but observed that the importance of the government interest "bears an inverse relationship to the rigor of the narrowly tailored analysis," and repeated its finding that the security concerns stated by the city were of "the highest order." *Id.* at 1221. The court found that the city's security zone advanced that interest because it limited access to the meeting site to identified and screened individuals and because it allowed the city to devote its available police to maintaining the security perimeter, rather than screening protestors and monitoring protests within the zone. *Id.* at 1223. The court disagreed with the plaintiff's argument that small protests could have been accommodated on a permit-only basis, observing, among other things, that alternatives urged by the plaintiffs could not have been implemented without additional logistical burdens and drains on security personnel. *Id.* at 1224-25.

After finding that the security zone restriction was narrowly tailored, the court also found that there were adequate alternative channels of communication that remained for the plaintiffs. It

observed that the plaintiffs were "sufficiently able to communicate their message even though they had no close, physical interaction with their intended audience." *Id.* at 1225. The court explained that the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Id.* (quotation and citation omitted). Rather, the sufficiency of available alternatives is a fact-dependent analysis, considering things such as the nature of the security threat involved, the geography of the area regulated, the type of speech desired, and the nature of alternative means by which the speakers can disseminate their message. *Id.* at 1226. It found that although limiting the plaintiffs to protesting outside the checkpoint may not have been "the best alternative, nor even the most prudent," it was nevertheless sufficient, in light of the circumstances, given that attendees and media were able to view the protest as they passed by, that the protesters were later interviewed by several local media and that they could have also protested at the off-site staging area where meeting attendees and media members boarded buses to enter the security zone. *Id.* The court found that the plaintiffs were able to present their views to their intended audience and were not so cut off from that audience that one could say that no ample alternatives to a protest within the security zone existed. *Id.*

*Citizens for Peace In Space* is instructive in several respects. First, and perhaps most importantly, it recognizes that the creation of a geographically large security zone to protect a high-profile political gathering against threats of terrorist attacks and violent protests can withstand a First Amendment challenge from those whose ability to engage in speech activities inside the security zone is compromised. It confirms the importance of a reasonably specific security-based justification for the closure of traditional public fora and instructs that the more

important the governmental interest, the less exacting is the court's narrow-tailoring analysis. The case is also illustrative of the types of alternatives that might be deemed adequate to replace an in-person protest immediately outside a gathering. As is discussed in more detail below, the alternatives available here allow many of the same (and in some respects, more) opportunities for communication as *Citizens for Peace In Space*: the ability to speak to attendees when they board buses, an (enhanced) opportunity to communicate to attendees as they travel towards the meeting site, the opportunity for any attendee wanting more information to return to the speakers, and the ability of speakers to reach the attendees and the public through other media channels such as television and print.

### 2. *Menotti v. City of Seattle*

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005), involved regulation of protest speech at the 1999 World Trade Organization ("WTO") meeting in Seattle, Washington. Three weeks before the meeting began, a number of unknown individuals damaged retail stores and headquarters of timber companies and obstructed a Thanksgiving Day parade. *Id.* at 1120. On the day before the meeting began, protest activity, both peaceful and otherwise, increased. This included vandalization of property, protesters throwing rocks at police, and threats of harm to persons. *Id.* at 1120-21. On the day the meeting began, vandalism and looting of stores continued, protesters formed human chains so as to block access to intersections and buildings, threw bottles, rocks, and urine at police, lit fires, and assaulted innocent citizens.[17] *Id.* at 1121-22. Late that evening, the Mayor of Seattle issued "Emergency Order No. 3," which declared a state

---

[17]This is not to suggest that all, or even most, protest activity was violent or disruptive to public order. Indeed, the court noted the existence of large-scale, peaceful, law-abiding protests. *Id.* at 1123.

of emergency and imposed a "curfew," effectively creating a security zone in downtown Seattle that excluded all but WTO delegates, employees of businesses within the zone, members of the press, and public safety personnel. *Id.* at 1124-25. Vehicles and pedestrians would be permitted into the zone "if they have a reasonable purpose," such as to work or shop at a particular location within the zone. *Id.* at 1125. However, it was admitted that the security zone would effectively prevent protestors from marching or demonstrating within the zone.

The 9th Circuit found that the Emergency Order was content-neutral, in that it prohibited essentially all public speech within the security zone, even though it acknowledged that the effect of the Order was predominantly felt by anti-WTO protesters. *Id.* at 1129. It rejected arguments by the plaintiff that the Order was content-based because it did not prevent activity by shoppers and workers in the security zone, stating that "these exemptions did not enable the City to discriminate against ideas it disfavored." *Id.* at 1130. The court found that "[n]o one could seriously dispute that the government has a significant interest in maintaining public order." *Id.* at 1131. As to the narrowness of the fit between the closing off of a large swath of downtown and the city's significant security interests, the court observed that "large numbers of non-violent protesters prevented police from curbing effectively the activities of the violent protesters" by "buffer[ing] smaller pockets of protesters engaged in significant criminal acts." *Id.* at 1132. The court noted that the security zone was designed to encompass all of the buildings officially involved in the WTO meeting but to cover "only enough territory for the WTO delegates . . . to move safely from their hotels to the convention and [to last] only during the conference." *Id.* at 1133-34. Viewed in light of the entire circumstances, the court found that "it would not have been practical to require police, on a continuing basis, to make an accurate determination of each

protestor as violent or not-violent," such that a more nuanced security arrangement could be crafted. *Id.* at 1135.

Finally, the court turned to the availability of alternative channels of communication. As did the court in *Citizens for Peace In Space*, the *Menotti* court noted that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired" but acknowledged that "an alternative mode of communication may be constitutionally inadequate if the speaker's ability to communicate effectively is threatened." *Id.* at 1138 (internal quotes and citations omitted). The court characterized this as a "difficult question" insofar as the restricted zone "carved out a portion of the downtown area where protestors could not deliver their message directly to delegates." *Id.* at 1138. On the other hand, it noted that protestors could express their views outside the zone, including directly across the street from locations where the WTO meeting was taking place. *Id.* It found that "[t]hese available communications . . . were perhaps not ideal for protestors who wanted to present views in the face of delegates, but neither did they wholly exclude protestors from the delegates' purview." *Id.* at 1141. Thus, it found that there were adequate alternative avenues for communication and upheld the constitutionality of the Order.

*Menotti* provides additional enlightenment on several issues. Most significantly, it describes, in both a factual and legal sense, a security justification hinted at but not particularly developed in *Citizens for Peace In Space*: the threat posed by violent or unlawfully-disruptive protestors. *Menotti* both supplies a factual predicate for concerns that similar conduct could occur at the Convention here, as well as demonstrates that preventing such conduct by creating a large, sterile security zone that curtails some First Amendment opportunities can nevertheless survive

constitutional scrutiny. Moreover, *Menotti* is significant in its rejection of an argument that the Plaintiffs raise here and the Court discusses in more detail below – that allowing persons eligible to enter the security zone to engage in expressive activity therein is a form of content discrimination prompting strict scrutiny. Although it does not appear that the issue was presented as squarely in *Menotti* as it is here, the *Menotti* court clearly focused not on whether some individuals enjoyed more expressive opportunities than others but on whether the restriction "enable[d] the City to discriminate against ideas it disfavored." *Id.* at 1130. Finally, *Menotti* appears to contemplate an even more limited set of alternative communication channels as being sufficient than did *Citizens for Peace In Space*: so long as protestors had a reasonable ability to communicate with attendees at a distance, the lack of face-to-face opportunities did not warrant relief.

### 3. *Bl(a)ck Tea Society v. City of Boston*

*Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8 (1ˢᵗ Cir. 2004), involved an anticipatory First Amendment challenge to regulations imposed on protestors at the Democratic National Convention in Boston, Massachusetts in 2004. The United States Secret Service created a security plan similar to the one at issue here, including a security zone around the convention site which only delegates, staff, press, and other credentialed individuals were allowed to enter. *Id.* at 10. The city established a fenced, fabric-draped "demonstration zone" on the edge of the security perimeter, creating a space that would permit some opportunity to communicate messages to the delegates. *Id.* at 11. The plaintiffs brought an anticipatory First Amendment challenge, seeking a preliminary injunction that would modify the demonstration zone in various respects. Hearing the plaintiff's appeal from the denial of the plaintiff's requested preliminary injunction, the First

Circuit summarily concluded that the restrictions were content-neutral and that the city's professed interests in security were significant, leaving for discussion only the questions of narrow tailoring and adequate alternatives. *Id.* at 12-13. The court noted that the security measures "dramatically limited" opportunities for some forms of communication between the plaintiffs and the delegates, including leafletting, the use of visual media such as signs, and one-on-one discussions. *Id.* at 13. The court found that generalized justifications of "security" were insufficient to justify such restrictions, and that the narrow tailoring analysis must involve the particular harms that the security measures were designed to address. *Id.*

The city offered specific justifications for each decision regarding the design and configuration of the demonstration zone based on particular problems that had arisen at prior political conventions. For example, it justified a double ring of barriers and fences to prevent protestors from attempting to break through a single security perimeter; the fabric mesh was designed to protect delegates from being sprayed with liquids, as delegates at prior conventions had been. *Id.* The court acknowledged that there was no evidence of specific intelligence that suggested that the Boston demonstrators would attempt to engage in similar conduct and cautioned that while the city should be mindful of experiences at past conventions, it should not impose "harsh" burdens on speech as a result of "isolated past events." *Id.* at 14. Nevertheless, the court found that the stated security concerns were properly "weigh[ed] in the balance" by the district court and that the significant weight afforded that factor by the district court was not an abuse of discretion. *Id.* Thus, the court affirmed the district court's finding that the security measures, "though extreme, were nonetheless narrowly tailored." *Id.*

33

Finally, the court turned to the question of whether adequate alternative channels of communication remained. It noted that the city permitted "informal demonstrations" of less than 20 people to take place near the edges of the security zone and that "[s]everal other public spaces throughout Boston remained available for demonstrations." *Id.* The court rejected the plaintiff's arguments that these alternatives were insufficient because they were not "within sight and sound of the delegates." *Id.* It noted that the demonstration zone gave them that ability, albeit imperfectly, and that "there is no constitutional requirement" that demonstrators be granted the opportunity to interact directly with the delegates by, for example, moving among them and distributing literature. *Id.* The court also noted the availability of reaching the delegates through means other than "first-hand sight," including "television, radio, the press, the internet, and other outlets." *Id.* Thus, the court affirmed the district court's conclusion that adequate alternative channels of communication remained available. Although it acknowledged that "this is a close and difficult case," the First Circuit affirmed the denial of injunctive relief. *Id.*

At one point during this litigation, *Bl(a)ck Tea Society* may have seemed to be of critical analytical importance. One focus of the Plaintiffs' initial papers was the design and composition of the security measures around the Public/Demonstration Zone, presumably in an attempt to determine whether the Secret Service would attempt to recreate the highly-confining zone used in Boston on the more expansive grounds of Denver. However, once it became clear that Denver's Public/Demonstration Zone would adopt only a handful of Boston's features (and leave behind some of the most objectionable, including the sight-obstructing "liquid-dispersion fabric" and razor-wire topped fencing), the parties' focus shifted elsewhere, limiting some of *Bl(a)ck Tea Society*'s importance.

34

Nevertheless there are lessons to be derived from the case. Like *Citizens for Peace In Space*, it emphasizes that the generic boogeyman of "security" is insufficient to survive a narrow-tailoring review and that problems encountered in past events can inform security plans but will not, of themselves, justify extensive burdens on expressive opportunities. Finally, it demonstrates that adequate alternative means of communication can include the opportunity to engage in expressive activity in other locations around the area, even when such opportunities are not within "sight and sound of the delegates," and through the media and other electronic dissemination.

### 4. *Coalition to March on the RNC and Stop the War v. City of St. Paul*

Finally, the Court notes that in the last month, the United States District Court for the District of Minnesota addressed some of the same issues presented here as they relate to the 2008 Republican National Convention to be held in St. Paul, Minnesota. In *Coalition to March on the RNC and Stop the War v. City of St. Paul*, ___ F.Supp.2d ___, 2008 WL 2791612 (D. Minn., July 16, 2008), the court addressed a challenge to restrictions on a parade that the plaintiff wished to conduct during the convention. There, the plaintiff sought to conduct a 30,000-50,000 person parade on the evening of the opening day of the convention. The route requested by the plaintiff would take the march from the State Capitol, encircle the grounds of the Xcel Energy Center where the convention would be taking place, and then return to the Capitol. *Id.* at *1, 2. The city denied the plaintiff's request for a parade permit as it related to the requested route and time but issued a permit that allowed the march to take place in the early afternoon (before the commencement of convention activities) along a route that would not encircle the Xcel Energy Center but which would pass within 84 feet of one of the Center's main entrances and within 40-

60 feet of "media work spaces."  *Id.* at *2.  The plaintiff then sued, seeking a preliminary injunction directing the issuance of a permit for its preferred route and time.[18]

The court began by noting that "the Supreme Court has emphatically rejected the notion that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech."  *Id*. at *4, *quoting* Cox v. Louisiana, 379 U.S. 536, 555 (1965).  It then proceeded to analyze the established parade route under the same time, place, and manner analysis discussed above.

The court first rejected the plaintiff's argument, largely on factual grounds, that the city's process for granting parade permits was not content-neutral.  *Id.* at *6-7.  The court found that the city's concerns about security presented a significant governmental interest.  It noted that "[t]he concentration of high-ranking government officials and a substantial number of people presents daunting security challenges."  *Id.* at *8.  In addition to typical concerns regarding the potential of various types of terrorist attacks and assassination attempts, the court also observed that "many groups have endorsed a call to shut down the RNC by blockading the convention site, immobilizing delegates' transportation, and blocking bridges."  *Id.*  It found that the city "plainly ha[s] a substantial interest in securing the area immediately surrounding the convention site."  *Id.* The court also found that the city's denial of the plaintiff's requested route "directly served" the

_____

[18]During the case, the plaintiff proposed an alternative to its requested route.  Unlike the original route sought by the plaintiff, the alternative route would not closely encircle the Xcel Energy Center.  Instead, it would pass immediately adjacent to two of the four sides that comprise the perimeter of the parcel before heading back to the Capitol.  Nevertheless, the effect of the alternative route would still be to place the entirety of the Xcel Energy Center within the interior of the parade route.  *Id.* at *3.

city's interest in maintaining security. *Id.* It observed that prohibiting the plaintiff's plan to encircle the Xcel Energy Center "minimizes the potential for a blockade, preserves a secured zone around the convention site that mitigates the threat posed by a variety of weapons, provides a secure space in case an evacuation of the arena is necessary, provides for the delegates' safe and orderly arrival at and entrance into the arena, and [ ] allows emergency vehicles to access the arena." *Id.*

The court also addressed the issue of the timing of the approved parade, finding that restricting the parade to the early afternoon ensured that emergency vehicles would have unimpeded access to the nearby interstate highway during times when the convention was scheduled to be in session. *Id.* at 10. Although it did not engage in any particular analysis of the governmental interest involved, it appeared to find a "substantial government interest in access to and from one of the two interstates in the area for emergency vehicles" and implicitly found that the restriction on the parade's timing was narrowly tailored to serve that interest. *Id.* at *10.

Finally, the court turned to the question of whether ample alternative means of communication existed. The court took particular notice of *Bl(a)ck Tea Society*'s observation that access to the delegates through television, radio, etc., enhanced the available alternative means of communication and that the parade would pass within a few feet of space set aside for the media. *Id.* at *11. At the hearing, the city also described plans to create a "public viewing area" within sight and sound of the convention site, a site that the court compared favorably to "demonstration zones" created for other political conventions. *Id.* at *12. Finally, the court found that the plaintiff was not limited to exercising its First Amendment rights at the Xcel Energy Center but had access to "public spaces throughout the Twin Cities to communicate its message." *Id.* at *13.

The court separately considered whether the parade's timing offered adequate alternative means of communication and found that because the parade would last several hours, starting it a few hours earlier than the plaintiff had wanted nevertheless afforded ample alternatives for communication.  *Id.*  The court inferred from the plaintiff's argument that its real reason for wanting a later start time was to ensure that paraders would have the ability to confront delegates arriving for the evening's activities.  Noting that the plaintiff "has no constitutional right to physical access to the delegates," *citing Citizens for Peace In Space*, 477 F.3d at 1225, and *Bl(a)ck Tea Society*, 378 F.3d at 14, it nevertheless noted that delegates already present on the convention grounds would be able to view the earlier parade and that media coverage of the parade was likely to be substantial in any event.  *Id.* at *13-14.  "[T]he precise time of the march," the court found, "will not materially affect the [plaintiff's] ability to communicate its message via the parade."  *Id.* at *14.

*Coalition to March* adds several more ideas to the mix.  First, it demonstrates that disputes concerning parades are equally susceptible to the classic time, place, and manner analysis.  More importantly, it recognizes a host of significant governmental interests that arise in the parade context, such as concerns about parades obstructing emergency vehicles' access to the convention grounds or clogging evacuation routes and concerns that demonstrators engaging in civil disobedience may attempt to "shut down" convention activities by blocking delegates' access.  It also finds adequate a mix of alternative communication channels similar to those present here.  Interestingly, it is unusual insofar as it expressly considers the extent to which the <u>time</u> at which the parade is held is essential to the communicative nature of the parade and weighs that factor among other concerns that militate in favor of requiring it to occur at a different time.  As

explained herein, the speaker's ability to dictate of the context of his or her message is significant but not controlling of the analysis, a finding with which *Coalition to March* appears to agree.

In discussing these cases, the Court has scrupulously avoided playing a "numbers game"; that is, attempting to divine some bright line rule that a distance of X feet between speakers and delegates (or the Pepsi Center) is permissible but a distance of Y feet is not. Attempting to extract some hard-and-fast rule as to what is necessary to satisfy the First Amendment ignores the nuanced, multiple-factor analysis in which courts in these circumstances must engage. Thus, the mere fact that the parade in *Coalition to March* passed within 84 feet of the convention site and the fact that the protest in *Citizens for Peace In Space* could be shunted as far as 300 yards from the building are not, in and of themselves, helpful to the analysis. Without an appreciation of the entire suite of security measures, an understanding of the inherent topography of each site, and knowledge of all of the other factors that weigh in the balance, discrete measurements and other isolated facts from other events are not particularly illuminating.

### C.  Application to present facts

Having canvassed the applicable law, the Court now applies it to the facts of this case. There are effectively two types of issues identified by the parties and presented in this case: issues tied to the Public/Demonstration Zone and issues relating to parades. To some degree the facts and analysis applicable to each group overlap, but for purposes of clarity, the Court will analyze each group of issues separately.

#### 1.  Public/Demonstration Zone

The Plaintiffs have satisfied their burden of demonstrating that the city has restricted their ability to engage in expressive activity in a traditional public forum. It is undisputed that the

security perimeter around the Pepsi Center will restrict public access to city streets, such as Chopper Circle, 9th Street, and Auraria Parkway, and the parties have stipulated that these areas would otherwise be considered traditional public fora. The burden therefore shifts to the Defendants to justify the closure of those fora and the imposed restrictions under the *Ward* factors.

## A. Content neutrality

*Ward* teaches that the determination of whether a restriction is content-neutral depends upon whether the justification for the restriction is based on the content of the message to be conveyed, rather than upon whether particular speakers or messages are disproportionately affected. 491 U.S. at 791. The justification for closing of city streets within and adjacent to the Pepsi Center is primarily security-based. The testimony of Mr. Hughes and Mr. Battista is unrebutted. They identified concerns with regard to damage and injury that could be caused by explosive devices, the ability to screen persons entering the security perimeter for weapons, the ability to ensure ready access for emergency and law enforcement vehicles, and the ability to maintain an evacuation route from the Pepsi Center. Nothing in these justifications reflects any consideration of the content of any speaker's speech.

The Plaintiffs argue that the restrictions are content-based because credentialed persons entitled to be within the security perimeter will be permitted to carry signs, protest, and otherwise engage in expressive activity inside the security perimeter, but people who have not been given credentials cannot. The Court finds this argument unavailing for a number of reasons.

First, the Plaintiffs' assertion is premised upon the precept that exclusion of persons based upon their identity is, in effect, a regulation based upon their message. The Plaintiffs rely on a

40

single line from *Summum v. Duchesne City*, 482 F.3d 1263, 1273 (10th Cir, 2007), that "[i]n addition to exclusions based on viewpoint or subject matter, exclusions based on the speaker's identity trigger strict scrutiny when the forum at issue is public."  (This statement follows an observation by the court that "The City concedes it excluded Summum's speech based on its subject matter and the speaker's identity." *Id.* (emphasis added)).  The 10th Circuit did not explain what it meant by "identity," or otherwise elaborate, leaving only its supporting citations and the factual context of the case to explain its reasoning.

The cases it cited to are *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 808 (1985) and *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Neither case stands squarely for the proposition that an otherwise content-neutral regulation becomes subject to strict scrutiny if its application is linked to the identity of a speaker.  In *Cornelius,* an entity that engaged in lobbying and issue-oriented litigation challenged its exclusion from a charity solicitation program directed at federal workers.  Finding that the solicitation program was not a public forum, the court referred to the  "identity of the speaker" only in distinguishing non-public forum cases from those involving public fora.  It observed  that, "In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Id.* at 808, *citing* *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 47 (1983) (finding school's teacher mailboxes a non-public forum).  Thus, nothing in *Cornelius* directly stands for the proposition mentioned in *Summum* and relied upon by the Plaintiffs.

*Mosley* involved a city ordinance that prohibited picketing near schools, explicitly excepting "peaceful labor picketing."  That decision makes no use of the phrase "identity of the

speaker" in any capacity. At most, it can be understood in a First Amendment context[19] to state that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Id.* at 96. Although *Mosley* speaks of the government discriminating in favor of "people whose views it finds acceptable," it is clear that the object of the discrimination is not any particular person but instead, the views expressed by such people. In other words, *Mosley* does little more than cosmetically vary the well-settled proposition that the government must closely justify any regulation that discriminates among speakers based upon what they say.

In this light, the outcome in *Summum* is consistent with the ordinary content-neutral analysis. *Summum* involved a religious organization that sought to place a religious-themed monument in a public park, just as the city had previously permitted another religious organization to do. The city refused permission and the plaintiff sued, claiming, among other things, that the city's decision was content-based. As stated above, the city conceded that its decision was based on the content of the plaintiff's speech and the 10th Circuit expressly referred to the city's decision as being a "content-based exclusion." 482 F.3d at 1269. By contrast, beyond the casual reference to "speaker's identity," nothing in *Summum* suggests that a different speaker urging the same monument would have met with more favorable results such that one

---

[19] Technically, *Mosley* is not a First Amendment case. The Court analyzed the restriction under the Equal Protection clause. *Id.* at 95-96. It made only a passing suggestion that its analysis would apply "to the First Amendment itself." *Id.* at 96. Nevertheless, this Court will assume that *Mosley*'s analysis applies with equal force to the First Amendment.

could say that it was the <u>identity</u> of the plaintiff, not the content of its speech, that justified strict scrutiny.[20]

Having reviewed all of the authorities cited in the Plaintiffs' trial brief in support of this point, the Court finds that, like *Mosley*, cases use the expression "identity of the speaker" as simply a proxy for describing prohibited discrimination against or in favor of content or a particular viewpoint. Put differently, none of the cases stand for the proposition that an otherwise content-neutral restriction is subject to strict scrutiny because it effectively applies to one identified group of speakers but not others.[21] Whether couched in terms of the government expressing hostility to the speech's content, the speaker's viewpoint, or the speaker himself, the purpose of the content neutrality element is to examine whether the government is impermissibly acting against speech because of what is being said or whether it permissibly acts because of matters unrelated to the message being conveyed. Because the regulation here is content-neutral on its face, the fact that it may operate to permit some individuals to speak is simply an "incidental effect" of the regulation and does not trigger strict scrutiny.

---

[20]Arguably, the Court can conceive of a situation in which a government finds already troubling speech rendered utterly intolerable by the identity of the speaker. In such situations, a combination of content and identity might tip a regulation into viewpoint discrimination where either factor alone might not. Here, however, the Plaintiffs point to no discrimination by the Defendants between the content of speech to be practiced by credentialed individuals and the content of speech the Plaintiffs wish to engage in. Thus, the Plaintiffs' argument has vitality, if any, only if discrimination is based on a speaker's identity alone, without consideration of that speaker's viewpoint or content.

[21]Indeed, the courts readily accept facially-neutral regulations that have the effect of prohibiting speech by one group but not another. *See e.g. Black v. Arthur*, 18 F.Supp.2d 1127, 1135 (D. Or. 1998) (cited by Plaintiffs); *Ward*, 491 U.S. at 791 ("regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others").

Even assuming that in some cases, regulations that permit some specific individuals to speak in a public forum while others are excluded could constitute a type of content-based discrimination, the evidence does not support a finding that any governmental entity is engaging in content discrimination. It is undisputed that the Convention is a private event, being conducted on private property, with access only by invitation. It is the Convention Committee that issues credentials to whomever it sees fit. The Defendants are not involved with issuing credentials, and thus, to the extent that discrimination in viewpoint was considered in extending credentials, that discrimination cannot be laid at the feet of the Defendants.[22]

In addition, the determination of who receives credentials or is allowed within the security perimeter depends upon whether the person has a business connection with the Democratic

_____

[22]The only aspect of the credentialing that might involve governmental activity would be the City's acquiescence to the enforcement of the security perimeter. Plaintiffs cite to no authority for the proposition that, by closing public streets to accommodate a private event, the Defendants are chargeable with any content-based discrimination that the private actors engage in. Such a proposition is obviously untenable and would deprive a city of any ability to permit private events on city property. By definition, a private event on public grounds will exclude specific individuals who are not invited and thus will always discriminate against non-attendees on the basis of their "identity." Under the Plaintiffs' argument, a city's agreement to accommodate a private event on public property would thus always be subject to strict scrutiny, effectively making it impossible for any such events to occur.

   Although not squarely on point, a helpful analogue may be found in *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557 (1995). In *Hurley,* a private veterans organization contracted to use city streets for a St. Patrick's Day parade. A gay rights group challenged its exclusion from the parade. The gay rights group's claims against the City of Boston were dismissed below and not appealed to the Supreme Court. Hence, the Supreme Court's decision focused solely on whether the veterans group could be compelled under state law to allow the gay-rights group to march. It held that the state's law prohibiting discrimination in public accommodations could not be used to compel the veterans group to permit the gay rights group to march. Although not factually identical, *Hurley* is instructive in the conclusion it reaches: if it is impermissible for the state to compel a private group to open its private event to anyone who wishes to speak, the state cannot logically be held responsible for the exclusionary nature of the private event.

National Convention.  Hence, the people allowed to enter the security perimeter include delegates, guests, members of the media, persons operating the Pepsi Center, law enforcement officials, and emergency personnel, etc.  Arguably, any of these people are free to engage in expressive activity inside the perimeter.  But there is no showing that these people have any particular view or message that is necessarily different than that which would be expressed by those who are unable to gain admission.  There is no evidence, for example, that the Convention Committee has only issued credentials to those Pepsi Center electricians who are registered Democrats or that it has refused to give credentials to Republican-leaning media outlets.  (Indeed,  given the well-publicized dissension expressed by some disaffected delegates from Florida and Michigan, or pledged delegates expressing unwavering loyalty to Hillary Clinton, it would come as no surprise if even some delegates themselves chose to demonstrate or speak out in favor of candidates other than those urged by the Democratic Party.)  Without evidence that the Defendants control who receives credentials and that credentials serve as a reliable proxy for ascertaining the views of a speaker, the Court cannot find that allowing only credentialed individuals, but not the public, within the security perimeter is discrimination based upon or the content of speech.

For the foregoing reasons, the Court finds that the closure of access to traditional public fora within the Pepsi Center grounds is justified without regard to the content of any anticipated speech.

## B.  Significant government interest

As the cases discussed above make clear, every court to consider First Amendment challenges in these circumstances has found that the governmental interest in protecting attendees at high-profile political functions and the public in general against terrorist attacks and violent demonstrations is a significant one.  *See e.g. Citizens for Peace In Space*, 477 F.3d at 1220; *Coalition to March, supra* at *8*.  Moreover, courts have readily recognized that the governmental interest in maintaining public order and preventing traffic and sidewalk obstructions are significant as well.  *Schenck*, 519 U.S. at 375-76; *Menotti*, 409 F.3d at 1131.  The Court does not understand the Plaintiffs to dispute that the Defendants invoke these interests nor to dispute that such interests are, on their face, significant.  Rather, the Court understands the Plaintiffs to argue that the restrictions are not narrowly tailored to address such interests.

## C.  Narrow tailoring

Cases like *Citizens for Peace in Space* and *Bl(a)ck Tea Society* make clear that broad, generic invocations of "security concerns" are insufficient to justify large-scale restrictions of expressive speech.  477 F.3d at 1221, *citing Bl(a)ck Tea Society*, 378 F.3d at 13.  The term "security" cannot simply be brandished as a talisman to justify all burdens on speech.  *Id.*  Instead, the particular security measures must be tied to identifiable risks and harms against which they are designed to protect.  *Id.*

The requirement of narrow tailoring does not require, however, that government officials are limited to the development of security measures only in response to specific, known threats, nor that they are required to lay bare their intelligence and assumptions when security measures are challenged.  *Bl(a)ck Tea Society*, 378 F.3d at 13 (past experiences may be given weight even

in the absence of specific intelligence that they may reoccur). At its heart, the task of devising a security scheme is inherently a predictive process, requiring planners to make assumptions as to what threats there are, how likely they are to occur, and what harm might result if they do. Formulation of security measures also must include an assessment of the particular characteristics of the event, including its timing and the geography of its location. As with any prediction, one can always find fault with its accuracy or second-guess the underlying assumptions. A rule that would require the government to shape its security plans around only the most predictable threats would needlessly hobble the ability to anticipate and prevent the unusual and creative threat. Similarly, it is well-understood that maintaining a degree of secrecy as to the threats anticipated and the means devised to thwart them serves a deterrent purpose, one that would be lost if the government were required to disclose its thought process in exacting detail. Simply put, some degree of deference must be afforded to the government's judgment as to the most effective means for achieving its security goals. *Bl(a)ck Tea*, 378 F.3d at 13; *Citizens for Peace In Space*, 477 F.3d at 1221 ("we will give deference to a reasonable judgment by the City as to the best means of providing security at the NATO conference").

By the same token, however, unrestrained deference to unidentified, unspecific, illusory, or remote security concerns tilts the scales too far to the government's favor at the expense of citizens' rights.[23] To be narrowly tailored, there must be some reasonable fit between the clearly defined, stated concerns and the restrictions on speech. *Bl(a)ck Tea Society*, 378 F.3d at 13-14.

---

[23]Indeed, the Court has no doubt that one common subject of public speech and protest at the Convention will be the perception that increasing restraints on civil liberties are being justified by vague claims of "national security."

In other words, the more extensive the restrictions, the more precise the justifications for that restriction must be.

Here, the restrictions on speech consist of the closure of short sections of several small public streets (*e.g.* 5th, 7th, 9th, 11th, and 12th Streets) that enter into the Pepsi Center grounds, one moderately-sized street (Chopper Circle) located entirely on the Pepsi Center grounds, and portions of two large streets (Speer Boulevard and Auraria Parkway) for specific times, to specific users, and under specific conditions during the Convention. When closed, all public expressive activity by non-credentialed individuals is effectively prohibited in these areas.

The Defendants justify these closures by pointing to three major interests: (i) the need to protect buildings and persons around the Pepsi Center from attacks using explosives or biological, chemical, or radiological means; (ii) the need to protect law enforcement officers and civilians against violent attacks by demonstrators; and (iii) the need to ensure unobstructed road access into and out of the Pepsi Center grounds during the convention, and particularly in the event of emergency.

Mr. Hughes, of the Secret Service, testified about the concern for attacks by explosive devices. He cited past events in New York City and Oklahoma City, in which vehicles were used to carry and detonate large amounts of explosives, causing damage to buildings and injury to persons in and around those buildings. The parties' stipulated facts also note that Mr. Hughes considered the 1996 Atlanta Olympic bombing, in which an individual carried a smaller explosive into a crowded gathering, leaving it behind and remotely detonating it, causing numerous injuries. Mr. Hughes testified more generally to studying and drawing from "bomb attacks around the

world" and made passing reference to "biological and radiological attacks" but with little specificity.

Although the record on this point is less-developed than it might be, the Court finds that there is a sufficient fit between the concern for explosive-based attacks and the closure of some of the streets within the Pepsi Center grounds. Portions of 9th Street, 11th Street (perhaps even some of 12th Street), and Chopper Circle pass in very close proximity to the Pepsi Center itself. Mr. Hughes testified that, depending on the quantity involved, detonation of an explosive device on Chopper Circle could cause critical structural damage to the Pepsi Center and/or injuries to individuals working in and around the building. Mr. Hughes' testimony was not specific as to the maximum explosive payload that might reasonably be expected nor the particular range at which the damage of such an explosion would be most devastating. Although these facts would undoubtedly help in measuring the security radius that is required, it is possible that such information is too specific to reveal without compromising the security plan. Under such circumstances, the Court cannot say that the absence of this evidence defeats what is otherwise a fairly apparent fit between concerns for the use of explosives and the closure of those streets closest to the Pepsi Center.

Similarly, the concern for human-borne explosives reasonably justifies closure of streets more remote to the Pepsi Center building. It is less apparent that explosives detonated on, say, 7th Street or Speer Boulevard might pose a risk to the Pepsi Center or to persons in its immediate vicinity. Exhibit 45, a planning map, reveals that most of the open space on the Pepsi Center grounds will be occupied during the Convention by media pavilions, broadcast sites, and other areas that can be expected to house large numbers of people throughout the day. Detonation of

explosive devices, whether borne by vehicles or hand-carried, along one of these more remote streets could nevertheless be expected to cause significant injuries in such crowded conditions. Thus, the Court finds that concerns about the possibility of injuries and damage caused by the use of explosive devices reasonably justify the decision to close the remaining streets in and around the Pepsi Center to vehicle and pedestrian traffic.

The Plaintiffs argue that, even if reasonably justified, the restrictions are overbroad, affecting substantially more speech than is necessary to serve the Defendants' security interests. For example, they point out that a portion of Speer Boulevard will be opened each day between 6:00 a.m. and 9:00 a.m., allowing hundreds of unscreened vehicles to pass by the Pepsi Center grounds and those same media pavilions but that same stretch of road will be unavailable to the public on foot in the afternoons and evenings. On the surface, the Plaintiffs correctly note that the Defendants' security plan is not perfect. Undoubtedly, the Defendants could craft a security scheme that would seal off Speer Boulevard at all times, regardless of the burdens it poses on morning commuters. Or, it could devise a plan that might protect against injuries and damage from explosives, yet permit some vehicular and pedestrian access on some of the closed streets (*e.g.* by establishing additional screening stations to ensure that pedestrians and vehicles seeking to use the public streets are not carrying explosives). But, as discussed above, the First Amendment does not require the Defendants to create an ideal, or even the least-restrictive, security plan. They are merely obligated to devise a scheme that does not significantly overburden First Amendment rights.

To be sure, the Court finds that the closure of the city streets within the Pepsi Center grounds  burdens the Plaintiffs' ability to engage in speech and assembly, but given the

anticipated harms that the security restrictions seek to address, the Court cannot say the restrictions are overbroad. *Compare Citizens for Peace In Space*, 477 F.3d at 1221 (noting inverse relationship between the severity of the harm to be protected against and the rigor with which the narrow tailoring element will be assessed). An alternative that would allow pedestrian use of the streets on the Pepsi Center grounds or adjacent thereto would necessarily require that those using the streets be screened for explosives, and such screening would undoubtedly impose significant additional burdens on the Defendants for staffing and equipment. *Id.* at 1223-25. Accordingly, the Court finds that the decision to close the specified streets has been narrowly tailored to fit the substantial governmental interest in protecting buildings and people on the Pepsi Center grounds from the use of explosives and firearms.

In addition, the Defendants contend that the closure of the streets is necessary to protect Convention attendees and personnel and law enforcement officers from violent attacks by unruly demonstrators. Both Mr. Hughes and Mr. Battista testified that they had reviewed websites from various protest groups. Some websites, including that of Plaintiff Recreate 68, display information designed to educate demonstrators as to techniques that can be used in both defensive and offensive modes against police and others. For example, Recreate 68's website impliedly, if not expressly, endorses protestors to use "extreme self-defense" tactics against police. Mr. Battista described these tactics as including throwing of projectiles, using bludgeoning weapons, paint bombs, bricks, and other devices to "provide tactical advantages in disorientating [sic] the police." Although Recreate 68 may not officially endorse[24] either violence or the specific

---

[24]Mark Cohen, a representative of Recreate 68, testified that information about protesting and resistance techniques was placed on Recreate 68's website solely for "educational and entertainment purposes." Taking such testimony as true, Recreate 68's subjective intentions are

techniques it posts on its website, the Plaintiffs acknowledge their awareness that there are other groups and individuals that intend to engage in violent behavior.

Faced with this admission, the Defendants are entitled to devise security measures to protect against such conduct. The closure of streets inside the Pepsi Center to unscreened and non-credentialed individuals is certainly a reasonable fit to a concern that demonstrators will engage in violent acts towards law enforcement or Convention personnel. Without the ability to distinguish the peaceful speaker from the violent demonstrator until after violence has begun, the Defendants must be given the opportunity to create a bright line, within which one may assume that safety is assured. That line is the designated security perimeter. Because the threat of violent demonstrations could arise anywhere violent demonstrators would come into contact with their likely targets, law enforcement officers, or Convention delegates, the restrictions on public access are reasonably tailored insofar as they relate to places where law enforcement personnel and delegates are most likely to be found: on the grounds of the Pepsi Center.

Finally, the Defendants justify closure of streets with access to the Pepsi Center – *e.g.* Auraria Parkway and Speer Boulevard – based on concerns that demonstrators may obstruct the streets and refuse to move, thereby hampering the ability of emergency vehicles to access the Pepsi Center and endangering the evacuation plan for the Pepsi Center grounds. Mr. Hughes testified that security restrictions were developed, in part, based upon considerations of traffic management, including the need for emergency vehicles to access the Pepsi Center grounds, and the need for clear evacuation routes out of the Pepsi Center, if necessary. Mr. Battista's testimony

_____

irrelevant. Whether it posted provocative material intentionally, in jest, or by good-faith mistake, it cannot be heard to complain that the information contributes to a perception of a security risk.

pointed to several website postings in which a number of protest groups threatened and exhorted others to "shut down, disrupt, or delay the convention."[25]   The Court agrees that the closure of streets inside and adjacent to the Pepsi Center grounds is a reasonable fit to address concerns that people may obstruct traffic to or from the Convention grounds; one cannot obstruct a street if no one has access to it.

The closure of these streets does not burden substantially more speech than is necessary. The Plaintiffs posited to Mr. Hughes that the southern lanes of Auraria Parkway, a multi-lane street with a center median, could be set aside (*i.e.* those lanes furthest from the Pepsi Center) for protest activities while ensuring that the northern lanes remained open for emergency traffic.  Mr. Hughes rejected this possibility, explaining that various emergency vehicles and assets would be "pre-staged" on athletic fields south of Auraria Parkway such that they would require access to Auraria Parkway to cross over to the Pepsi Center or to remove people from the area.  Mr. Battista offered a similar opinion.  He explained that the Defendants' concern is for "people that are [ ] intent on conducting unlawful behavior," and that "if those intersections are taken over by protestors . . . it could take me hours to open them; and that would jeopardize the evacuation

---

[25]Both Mr. Hughes and Mr. Battista testified about street obstruction techniques that demonstrators were known to use, including linking themselves together to form a "sleeping dragon," a formation that can take hours to clear.  Mr. Hughes was not asked to specifically identify situations in which sleeping dragons or similar protest techniques had actually been attempted or used, and Mr. Battista acknowledged that he had never encountered such tactics used in Denver.  The Plaintiffs argue that it would be impractical to create a sleeping dragon in the circumstances presented here.  Whether demonstrators form a sleeping dragon, as opposed to some other disruptive and time-consuming formation, is beside the point.  The evidence adequately shows that some demonstrators seek to disrupt the Convention, and that there are various techniques that would permit a determined demonstrator to form a disruption that would take a lengthy period of time to overcome.  This is enough to justify concern that such techniques, or others like them, may actually be used.

plan." The testimony of Mr. Hughes and Mr. Battista was unrebutted on these points. Thus, the Court finds that the full closure of Auraria Parkway serves the significant governmental interest of ensuring free traffic flow for emergency vehicles. The Court also finds that the closure of Auraria Parkway out of traffic concerns does not burden more speech than is necessary. By definition, the Defendants' concern for keeping Auraria Parkway unobstructed prevents any use of the roadway by protestors.

The closure of Speer Boulevard is a closer call, however. The Plaintiffs are correct that it undercuts the Defendants' security rationale to allow it to be open each morning for rush hour traffic but closed thereafter. In addition, it is a multi-lane thoroughfare with a divider, and part of it is included as a parade route. Little specific explanation was provided on this point, but it appears to the Court that the times in which traffic is permitted (6:00 a.m. to 9:00 a.m.) and times in which it is not (all times after 9:00 a.m., with streets clearing well before Convention activities begin), indicate that the purpose of the partial closure of Speer Boulevard was intended to balance the need to permit rush hour access to downtown Denver in the morning with the need to ensure protection against explosive-based attacks and the need for the streets to remain clear for Convention activities in the afternoon and evening. Mr. Hughes admitted that the passage of numerous, unscreened vehicles within close proximity to media areas along Speer Boulevard during the morning rush hour poses many of the same risks of explosives-based injuries that the afternoon closure of Speer Boulevard was intended to prevent. But the test of narrow tailoring is not whether the government has selected the most effective or least restrictive solution, but only that it has chosen an approach that reasonably fits the government's needs and does not unnecessarily impose substantial burdens on speech. Judged by this standard, the closure of Speer

Boulevard on these terms is narrowly tailored to serve the government's interests.  Although the Court might speculate as to other possible alternative treatments for Speer Boulevard that might balance the competing interests more elegantly, it is not permitted to reject the City's plan simply because it thinks another might be better.

Thus, the Court finds that the restrictions on access to city streets within and adjacent to the Pepsi Center grounds are narrowly tailored to advance significant governmental interests.[26]

### D.  Adequate alternatives

Finally, the Court turns to the question of whether there are adequate alternative channels by which the Plaintiffs can communicate their messages.  This analysis examines several components, but the parties have focused most of their attention on the Public/Demonstration Zone as a substitute for access to the city streets.

In their pre-trial statement of the issues, the Plaintiffs identified their primary dispute with the Public/Demonstration Zone was that it was not within "sight and sound" of the passing delegates and the Pepsi Center itself.  Before proceeding, the Court briefly examines the significance of the phrase "sight and sound" as a means of measuring a constitutionally adequate distance.

As best the Court can determine, the phrase "sight and sound," as being a measure of the maximum acceptable distance between a speaker and his or her intended audience, is not a

---

[26]In doing so, the Court declines to credit the testimony of Anthony Bouza, the Plaintiffs' expert on security planning.  Mr. Bouza undoubtedly has a long and distinguished career in law enforcement and consulting, but he did not articulate any meaningful methodology or detailed explanation for his opinion that the Defendants' security precautions were overbroad.  The Court specifically notes that Mr. Bouza has not been actively involved in law enforcement since 1988 and is admittedly unaware of the particular security issues associated with the Democratic National Convention at this location.

standard used by the Supreme Court in its First Amendment jurisprudence. Few[27] courts have

used the phrase, much less discussed, its meaning. As a consequence, it is unclear what its legal

or practical parameters are.

Although the following questions might seem rhetorical, if the term "within sight and

sound" is a legal standard, they must be answered in order to formulate a definition. From whose

vantage point is "sight" or "sound" measured - the speaker or the audience? For example, is it

sufficient for delegates in the upper boxes of the Pepsi Center to be able to see over the media tent

to the Public /Demonstration Zone, or is it necessary for speakers in the Public/Demonstration

Zone to see the delegates that view them? Is a speaker within "sight" if she is merely within the

range of normal visual perception (potentially thousands of feet under certain conditions)? Or

does "being within sight" limit the range to that in which a speaker can be identified as a person,

or where attributes of that person can be distinguished, or when a sign with text of a particular

size held by the speaker can be read by the viewer? Is the speaker within "sound" of her audience

if the audience can perceive that someone is speaking, or must the audience be able to discern the

content of the message? Does the effect of cacophony or background noise change the

calculation? Does amplification matter, or is it required?

_____

[27]The expression found its most prominent use in *Bl(a)ck Tea Society*, 378 F.3d at 14 ("The appellant's chief rejoinder is that these alternatives were not sufficient because none of them were within sight and sound of the delegates . . . We disagree . . . the DZ did provide an opportunity for expression within sight and sound of the delegates"), and later, in *Coalition to March*, *supra*.

It is used in passing as a measure of distance between speaker and audience in *Johnson v. Bax*, 63 F.3d 154, 157 (2d Cir. 1995), and in *New Alliance Party v. Dinkins*, 743 F.Supp. 1055, 1056 (S.D.N.Y 1990). However, neither of these cases appears to ascribe any analytical significance to the expression.

It is clear that in recent litigation, parties have desired to affix largely assumed and unspoken (and potentially conflicting) meanings to these terms, ostensibly to create some alternative means of measuring constitutionally acceptable distances. But, despite its catchy and cogent format, the phrase "sight and sound" does little more than restate the obvious - expressive speech is designed to communicate. What restrictions will permit communication depend upon the particular circumstances in which they are imposed.

There can be little dispute that people in the Public/Demonstration Zone will be able to see and be seen, as well as be heard, by delegates walking from 7th Street to the Pepsi Center. It is undisputed that, on average, the delegates who do not desire to approach the Zone will be approximately 200 feet, roughly 66 yards, from it. Those who desire to come closer can get within 8 feet of it. At 200 feet, it may be difficult for delegates to make out small details, small signs or gestures. But the evidence is unrebutted that a sign with letters of 8-10 inches held by a person within the Public/Demonstration Zone will be able to be easily seen and read by a delegate on the sidewalk. Testimony by Siegfried Soli, an acoustics expert, that delegates on the sidewalk would likely be able to hear and understand the unamplified voice of a single demonstrator in the Public/Demonstration Zone and would almost certainly hear a protestor using a small bullhorn or other form of amplification was also unrefuted. Those within the Public/Demonstration Zone will have the ability to bring in bullhorns and have access to an amplification system supplied by the City.[28] In addition, members of the public, whether in the Public/Demonstration Zone or not, will

---

[28] Other than letting the public within the security perimeter, the alternatives requested by the Plaintiffs offer little improvement. For example, according to Exhibit 6-2, assuming protestors were allowed up 9th Street to the outer circumference of the roundabout, they would be some 300 feet from the spot where delegates enter the Pepsi Center and approximately 160 feet from the center of the sidewalk used by the delegates. If at all, this is only marginally closer than

have the ability to supply interested delegates with leaflets and other written material. Viewed in these terms, the Court finds that the Public/Demonstration Zone presents an adequate alternative channel of communication for members of the public to express their views to the delegates walking from buses to the Pepsi Center.

As to delegates who approach the Pepsi Center by foot without passing by the Public/Demonstration Zone, they may be encountered by the public at their hotels or anywhere along their route until they reach the security perimeter. Once within the perimeter, they are free to go to the Public/Demonstration Zone or to access written information from the leaflet table or computer, if they wish.

For several of the Plaintiffs' witnesses, the primary complaint regarding the Public/Demonstration Zone is not that is out of range of delegates but instead that it does not have an unobstructed view of the Pepsi Center building. This is important, they contend, to visually communicate their location to an audience outside of the Pepsi Center – and perhaps one that is located outside of Colorado altogether. Mr. Cohen testified that "when the media present images of the demonstrators within the demonstration zone, there will be no way to visually connect that zone to the Pepsi Center." Although her testimony related primarily to parades, which the Court will address *infra*, Jennifer Pease testified that her organization, Plaintiff Tent State University,

---

the access offered by the Public/Demonstration Zone.

Moreover, Mr. Soli testified that one would be unable to select a particular verbal message from a chorus of disparate messages being shouted simultaneously, regardless of the distance between the speakers and the listener. Even assuming that the public had free access to delegates on the public streets of the Pepsi Center grounds, one could reasonably assume that each delegate would likely be subjected to shouts and messages from several members of the public at once, making their messages no more discernable than messages shouted from the Public/Demonstration Zone itself.

wished to protest symbolically, by having its members turning their backs to the Pepsi Center and walk away. Without the visual image of the Pepsi Center behind them, she testified, the symbolic value of the message was diluted. In essence, the Plaintiffs argue that their message consists of not just its content but also the location in which it is delivered.

Certainly, situations can occur in which "the location of the expressive activity is part of the expressive message, [such that] alternative locations may not be adequate." *Long Beach Area Peace Network*, 522 F.3d at 1024; *Galvin v. Hay*, 374 F.3d 739, 756 (9th Cir. 2004). "Speaking in front of a relevant backdrop," the court in *Galvin* explained, "gives greater force to the messages conveyed to [the intended] audience." 374 F.3d at 749. It noted Supreme Court precedent that courts presume that "speakers, not the government, know best both what they want to say and how to say it." *Id.* at 750, *quoting Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 790-91 (1988).

This Court accepts the Plaintiffs' representations that their messages are more forceful if made in context of the Convention and that such context can be provided with the Pepsi Center as a backdrop in a film or photograph. As the court in *Galvin* notes, it is not for the court to second-guess the extent to which the speaker's location is essential to his or her message. However, on this point, it is important to remember that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Citizens for Peace In Space*, 477 F.3d at 1225, *citing Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).

The Plaintiffs have overlooked an important fact: the Public/Demonstration Zone was designed to provide meaningful access to the delegates, rather than to provide media-worthy views of the Pepsi Center. Complaining that views of the building from the Zone are inadequate

to showcase the Pepsi Center criticizes the Zone for something it was never intended to provide.

Those who wish to demonstrate with the Pepsi Center featured prominently in the background have a number of alternative opportunities to do so. Exhibit 9-1, a photograph taken from the corner of 7th Street and Auraria Parkway, near the entrance to the Public/Demonstration Zone, shows a fairly significant partial view of the Pepsi Center, particularly its glass-fronted entranceway. Anyone photographed in that location could avail themselves of that distinctive view. Alternatively, those seeking a photo opportunity may participate in the Sunday parades, which will pass down Auraria Parkway within a few hundred feet of the Pepsi Center, and will afford unobstructed views of the building at several points along the way, most notably where Speer Boulevard, 9th Street, and 11th Street each intersect Auraria Parkway. *See Exhibit* 9-8 (substantial view of the Pepsi Center from corner of Speer Boulevard and Auraria Parkway). A third possibility is demonstrated by Exhibit 9-9, which displays a particularly striking view of the Pepsi Center from the intersection of Speer Boulevard and Wewatta Street. Although Speer Boulevard will be closed to pedestrian traffic, maps suggest (and the Defendants confirmed at closing arguments) that the public will be free to use Wewatta Street, right up to the intersection with Speer Boulevard, to protest.[29] Thus, those who wish to be photographed with the Pepsi Center in the background have a variety of opportunities to do so.

Admittedly, protestors who wish to be photographed standing in the Public/Demonstration Zone, communicating with delegates, with the Pepsi Center in the background, will find

---

[29]Satellite photos in evidence show a large park to the north of the intersection of Speer Boulevard and Wewatta Street. Nothing in the record indicates that this park will be closed to public access during the Convention.

themselves with a difficult (but not necessarily impossible[30]) task.  But a speaker's desire to control all of the conditions that affect his or her message occasionally must yield where imperfect-yet-adequate alternatives exist.  *See e.g.* *Mahoney v. U.S. Marshals Service*, 454 F.Supp.2d 21, 37 (D.D.C. 2006) ("Defendants have taken pains to ensure that demonstrators . . . are able to exercise their First Amendment rights in the area.  But this does not mean that they must allow plaintiffs . . . to demonstrate in whatever place they consider to be optimal . . . they have been left with ample alternatives").  As cases like *Long Beach* and *Galvin* explain, the location and visual elements of a speaker's message may be an important part of that message.  However, they are merely factors to be weighed as part of the adequate alternatives element; they are not necessarily dispositive of that question.  To hold otherwise would be to permit the speaker to dictate the precise time, place, and manner of his or her desired speech as being essential components, thus trumping any possibility of adequate alternatives and dooming an otherwise reasonable restriction by the government.   When weighed in light of the foregoing, the Court finds that there are enough alternative ways to frame the Pepsi Center as a photographic backdrop to expressive activities to allow the Plaintiffs ample opportunities to communicate their messages.

Finally, in addition to the communication opportunities presented by the Public/Demonstration Zone, the Sunday parades, and other locations with unobstructed views of the Pepsi Center, the record reflects that the Plaintiffs have received permits to hold a variety of

---

[30]In addition to the ambiguity in Ms. Hoffman's testimony as to whether there are other locations within the Zone that provide a more substantial line of sight to the Pepsi Center, the Court will not underestimate the resourcefulness of the media's legion of professional photographers, whose interests in creating a dramatic image neatly coincide with the Plaintiffs' interests in being seen in a dramatic image.

events in public parks around Denver[31]; have received permits to march in daily parades along the approved parade route[32]; are free to speak, demonstrate, or leaflet on any public streets in Denver outside the security perimeter (including outside Convention hotels); may communicate to delegates through the use of the leaflet table; and may avail themselves of the myriad of traditional media channels that exist to disseminate ideas (*e.g.* local radio, television, newspapers, the Internet), as well as the presence of thousands of outside media representatives coming to Denver to cover all of the aspects of the Convention. Admittedly, no one of these alternatives accommodates every advantage that access to the public streets around the Pepsi Center does. But taken together, the Court finds that they provide adequate alternative channels by which the Plaintiffs can communicate their messages.

Accordingly, the Court finds that the Plaintiffs are not entitled to relief on their claim that the closure of city streets or the location or configuration of the Public/ Demonstration Zone violates their First Amendment rights.

### 2. Parades

The Court then turns to the claims involving parades. As stated previously, three issues are raised with regard to parades: (i) whether the approved parade route violates the Plaintiffs' First Amendment rights because it does not pass within "sight and sound" of the Pepsi Center; (ii)

---

[31]Exhibit 55 indicates that Tent State University has been granted eight event permits for events to be held in three different parks, which are expected to attract as many as 20,000 attendees each day of the Convention. Recreate 68 has been granted four permits for events to be held in two different parks, which are expected to attract as many as 25,000 people.

[32]Exhibit 56 shows that Recreate 68 has permits to conduct parades, expected to attract 10,000 marchers each, all four days of the Convention. Tent State University has a permit to conduct a parade expected to attract 5,000-10,000 marchers on Wednesday, August 27.

whether the Sunday parade route violates the Plaintiffs' First Amendment rights because it does not pass along Chopper Circle; and (iii) whether Recreate 68's First Amendment rights are violated by the Defendants' refusal to authorize the Downtown parade.

It is not clear whether the Defendants contest whether the Plaintiffs have carried their burden of showing a restriction on First Amendment activity through the deprivation of a traditional public forum when it comes to the parade-based claims. Nevertheless, it is clear that streets are a public forum that must occasionally be made available for marching, picketing, and other expressive conduct. *Acorn v. City of Phoenix*, 798 F.2d 1260, 1267 n. 5 (9th Cir. 1986). Moreover, the Defendants have made clear that, in light of the parade permits already issued, they will not authorize any further parades (or modify the routes of currently approved parades) during the term of the Convention, meaning that all other opportunities for expressive activity in the form of parades during this time period are foreclosed. Accordingly, the Court finds that the Plaintiffs have carried their burden of showing a burden on their First Amendment rights with regard to the parades.

Thus, the burden shifts to the Defendants to demonstrate that their restrictions on additional parades or modifications to parade routes are content-neutral, narrowly tailored to advance a significant interest, and that adequate alternatives for communication exist.

### A.  Content neutrality

Except as they may repeat the arguments raised above, the Court does not understand the Plaintiffs to argue that the parade-based restrictions are somehow content-based or otherwise subject to strict scrutiny. In addition to the reasons discussed above, nothing in the record suggests that justifications for the selected parade routes, the denial of requests to change those

routes, and the disapproval of Recreate 68's request for a Downtown parade were based in any way on the contents of any speaker's speech.  It is undisputed that the approved parade route is the same for all of the weekday parades, regardless of the message being conveyed by the marchers.

## B.  Significant governmental interest

The Defendants have identified several interests that are at issue with regard to the parade claims.  First, to the extent that the Plaintiffs challenge the failure of the Sunday parade route to pass along Chopper Circle, the Defendants have identified the same concerns about explosives, violent demonstrators, and obstruction of emergency and evacuation routes that the Court has already found to be significant.  In addition, the Defendants have identified a concern about overburdening the "grid" streets in the downtown area with traffic once Auraria Parkway and Speer Boulevard are closed.   Promoting the free flow of traffic on public streets is a significant governmental interest.  *Schenk*, 519 U.S. at 376.

## C.  Narrow tailoring

Each of the parade-related issues involves a separate narrow-tailoring analysis.  Thus, the Court will address them *seriatim*.

### (i)  Terminus of approved parade route

The Plaintiffs challenge the Defendants' decision to terminate the approved parade route at Larimer Street.  The Plaintiffs contend that the parade should be allowed to continue to the intersection of Speer Boulevard and Auraria Parkway, and perhaps down Auraria Parkway.

The Defendants explain that the Larimer Street terminus for the approved parade route was chosen not because of any inherent characteristics of that intersection, but because it is the last intersection where vehicles and pedestrians can exit Speer Boulevard before reaching Auraria

Parkway. Mr. Hughes testified that it was necessary to keep all lanes of Auraria Parkway open to accommodate access for emergency vehicles and an evacuation route. Mr. Hughes emphasized that the emergency transportation plan entailed vehicles traveling along Auraria Parkway as well as crossing Auraria Parkway at 9th and 12th Streets. Obviously, a parade taking place on Auraria Parkway at that time would block emergency access. But Mr. Hughes also expressed concern that lingering effects from a parade down Auraria Parkway could affect the ability of emergency vehicles to access the site after the parades have ended. He explained that marchers on the parade route may choose not to leave that route, serving to obstruct Auraria Parkway and/or the cross-streets after the parade ended and, indeed, if protestors resorted to unusual techniques such as forming a sleeping dragon, Auraria Parkway and/or the cross-streets could be obstructed for hours.

For the reasons previously discussed in finding that the decision to close Auraria Parkway to demonstrators was narrowly tailored to serve the important governmental interest of maintaining emergency traffic flow, the Court finds that the decision to restrict the daily parades from marching along Auraria Parkway is narrowly tailored to serve an important governmental interest. Admittedly, closing down Auraria Parkway to the daily parades during the Convention will burden the expressive rights of marchers, but the Court cannot say that burden is substantial when weighed against the Defendants' interests in emergency access. The burden on speech is simply the fact that Auraria Parkway is closer to the Pepsi Center, and offers some less-obstructed views than does Larimer Street. Yet the evidence shows that the approved parade route's terminus does offer a significant (albeit partially obstructed) line of sight to the Pepsi Center at the corner of Speer Boulevard and Larimer Street, *see* Exhibit 9-2, as well as for those marchers who

proceed from the terminus to the edge of the Public/Demonstration Zone, *see* Exhibit 9-1.  Thus, the incremental burden on speech between ending the approved parade route at Larimer Street versus ending it at Auraria Parkway is relatively small.

Accordingly, as to the approved parade route's terminus, the Court finds that the siting of the terminus is narrowly tailored to advance a significant government interest.

### (ii)  Use of Chopper Circle for Sunday parades

As clarified by the Plaintiffs in closing arguments, the Plaintiffs seek to divert the Sunday parades off Auraria Parkway at 11th Street, travel south onto Chopper Circle, and then return to Auraria Parkway via 9th Street.

Mr. Hughes testified that, on the afternoon of Friday, August 24, the Secret Service will evacuate the entire area within the security perimeter and engage in an extensive sweep for explosives, a process that will take as long as 10 hours.  Once that is accomplished, entry into the security perimeter will be only through screened checkpoints, ensuring that no explosives can be brought into the perimeter during the Convention.  Mr. Hughes testified that if the Sunday parade, which may involve thousands of unscreened marchers, were to be allowed to enter the security perimeter and pass along Chopper Circle, the Secret Service would be required to evacuate and re-sweep that area a second time.  Although the record does not indicate how long an additional sweep would require, it is undisputed that such a sweep would have to take place after the parades conclude, in the late afternoon or early evening on Sunday.  Notably, Sunday is the day before the Convention is scheduled to begin and a second sweep would pose a significant inconvenience to workers undergoing last-minute preparations of the Pepsi Center and affected areas.  Mr. Hughes also articulated other concerns, including the fact that the current security plan does not call for

streets inside the security perimeter to be barricaded in such a way that a parade along Chopper Circle could be adequately contained and the concern that protestors gaining access to Chopper Circle might engage in the same kind of obstructive tactics that justify closing Auraria Parkway during the daily parades. These concerns are certainly closely tied to the decision to deny access to Chopper Circle during the Sunday parades.

Much as the approved parade route's terminus on Larimer Street poses only a minor incremental burden on speech when compared to routing the parade onto Auraria Parkway, the decision to limit the Sunday parades to Auraria Parkway instead of allowing them onto Chopper Circle also is only minimally burdensome. The Plaintiffs concede that there are clear views of the Pepsi Center at several points along Auraria Parkway. Thus, a parade along Chopper Circle adds little to speech opportunities that are already available to the Plaintiffs. The Plaintiffs argue that passing close to the Pepsi Center along Chopper Circle is symbolic of delivering their grievances to "the doorstep of the Convention," but this is simply a matter of semantics; the "doorstep of the Convention" might just as easily be said to be the corner of 9th Street and Auraria Parkway, a spot that is already on the Sunday parade route.[33]  Given that the Sunday parade route will already pass close by and within clear visual range of the Pepsi Center, the Court cannot say that not being able to march on Chopper Circle significantly burdens the Plaintiffs' ability to speak. Accordingly, the Court finds that the routing of the Sunday parades is narrowly tailored to serve the Defendants' security concerns.

---

[33]The actual "doorstep of the Convention" is the front entrance of the Pepsi Center. Because it is on private property, it would be inaccessible to the Plaintiffs regardless of where they marched on city streets.

### (iii) Denial of Downtown parade permit

Finally, the Court turns to the question of Recreate 68's request for a Downtown parade. Recreate 68 requested a parade route that would travel north from Civic Center Park (it is not clear along which street) to 16th Street, then travel northwest to Stout Street, ending at one of the Federal Courthouses. The City of Denver denied this request for three reasons: (i) that it would "substantially interfere with traffic in the area," (ii) because "there are not sufficient city resources [*i.e.* police] to mitigate the disruption," and (iii) because the route "would limit accessibility of the RTD shuttle buses [along the 16th Street Mall] as well as severely impact the light rail system" on Stout Street. The first and third reasons articulate a governmental interest in ensuring the smooth flow of traffic, and the second reason articulates a concern for public safety and order, all of which are governmental interests that have already been noted as significant.

The denial of the request to conduct a Downtown parade clearly serves the identified traffic interests. Guillermo Vidal, Denver's Manager of Public Works, testified that the consequences of shutting down Speer Boulevard and Auraria Parkway during the convention had the effect of shifting tens of thousands of vehicles into the grid of downtown streets. He explained that during ordinary weeks, when no roads were closed, traffic on downtown's gridded streets was approximately 95% of the streets' carrying capacity. He stated that because of the re-routing of vehicles normally using Speer Boulevard and Auraria Parkway, the re-routing of vehicles to account for the closure of some of Colfax Avenue as part of the approved parade route, and the increased traffic incident to Convention-related activities in downtown, the grid streets would likely exceed 100% of their carrying capacity during the days of the Convention. As the City's letter denying Recreate 68's permit explains, the requested Downtown parade route would

68

require the closure of several downtown streets, preventing traffic on Tremont, Glenarm, California, and Welton Streets from crossing 16th Street in either direction for the duration of the parade and effectively closing down much of Stout (or Champa) Street.  Mr. Vidal noted that, when combined with the approved parade route that would be in use at the time, Recreate 68's Downtown parade route had the effect of nearly encircling a large portion of downtown Denver, including the Denver Convention and Performing Arts Centers.  In addition, Mr. Vidal explained that accommodating tens of thousands of marchers, in addition to the normal pedestrian load on the 16th Street Mall, would effectively shut down the Mall Shuttle buses and would disrupt light rail traffic on California and Stout Streets.  Mr. Vidal's testimony was not challenged on cross-examination[34] nor rebutted with other evidence, and the Court credits it in its entirety.

Given that the requested parade would inherently disrupt an already overburdened downtown traffic grid, it is difficult to see how the Defendants' decision to deny the requested permit could be more narrowly tailored.  Denial of the permit does not prohibit Recreate 68 from assembling at its destination, nor even "marching" there, so long as the participants follow the requested route using public sidewalks and obey traffic signals at intersections.  It is difficult to see how Recreate 68's ability to communicate its message would be diminished in such an event.  Even Mr. Cohen was unable to explain in anything other than vague terms how a "parade" along public sidewalks was injurious to the organization's message: "During this extraordinary event of

---

[34]The only question posed to Mr. Vidal on cross-examination was one with an inaccurate factual predicate, assuming that the requested parade route was a "three-block march from the 16th Street Mall to 19th Street along Champa [Street]."  Even assuming this question to constructively amend the requested parade route to travel down Champa Street instead of Stout Street, characterizing it as a "three-block march" fails to account for the parade's effect on seven streets that would be blocked as the marchers proceeded down 16th Street.

the DNC, it's important that we have an extraordinary event as well, which means putting people into the streets in order to bring major attention to our events." It is unclear to the Court how a march involving thousands of people on public sidewalks is any less "extraordinary" an event than one which takes place on the streets themselves. In any event, there does not appear to be any way in which a march of the type envisioned by Mr. Cohen could be conducted without adversely affecting the downtown traffic grid. Accordingly, the Court finds that the Defendants' decision to deny the Downtown parade permit was narrowly tailored.

### D. Adequate alternatives

This element does not require a great deal of additional discussion. In addition to participating in any of the 18 approved parades, the parties are free to assemble, demonstrate, and protest on nearly all of the city's public streets (subject to compliance with all generally applicable laws and ordinances). They may visit the Public/Demonstration Zone, avail themselves of the communicative opportunities afforded by their permits to hold events in city parks, and communicate through innumerable media outlets. For the reasons previously discussed, the Court finds that, given the minimal burdens on speech reflected in the parade-related denials, the parties have ample alternative channels in which they can adequately communicate their messages.

Accordingly, the Court finds that the Plaintiffs' First Amendment rights will not be violated with regard to any of the parade issues.

### V. CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiffs have shown that the challenged restrictions affect their ability to engage in expressive activities in traditional public fora. However, the Defendants have shown that the restrictions are content-neutral, that they are

narrowly tailored to serve important governmental interests, and that there are adequate alternative channels by which the Plaintiffs can communicate their messages. Thus, the Plaintiffs have not shown that their First Amendment rights will be infringed, nor that they are entitled to any injunctive relief. Judgment will enter in favor of the Defendants as to claims with regard to the Pepsi Center.

Dated this 6th day of August, 2008

**BY THE COURT:**

_(signature: Marcia S. Krieger)_

Marcia S. Krieger
United States District Judge